CHAMBLISS *v.* BRINTON, SPECIAL ADMINISTRATOR.

5-1634 317 S. W. 2d 143

Opinion delivered October 20, 1958.

[Rehearing denied November 17, 1958]

*Barrett, Wheatley, Smith & Deacon,* for appellant.

*McCourtney, Brinton, Gibbons & Segars,* for appellee.

PAUL WARD, Associate Justice. A tractor-trailer truck belonging to Victor Metal Products Corporation and driven by Elbert Chambliss ran into a pick-up truck owned and driven by Harley Shirrell. Five or six hours later Shirrell felt "knocked out all over," two or three hours later he suffered pains and was unable to move his legs, and 14 days later he died. A special administrator of Shirrell's Estate sued, and recovered judgment against Chambliss and the said corporation for several items of damages including $20,000 for pain and suffering.

Appellants, Chambliss and the said corporation, have appealed on two grounds only. *One.* There is no substantial evidence to show a causal relation between the accident and Shirrell's death. *Two.* The award of $20,000 for pain and suffering is excessive.

*One.* After a careful examination we have concluded there is substantial evidence to support the jury's finding of a causal connection. To substantiate our conclusion it is necessary to set forth at some length the pertinent facts and circumstances as disclosed by the record.

On January 3, 1957, Harley Shirrell of Myrtle, Missouri, 58 years of age and in apparent good health, was

driving his pickup truck south on Highway 67 below Pocahontas, Arkansas, between 5:30 and 6:00 a.m. at a time when it was dark, when his truck was struck from behind on the left rear corner by a tractor-trailer unit owned by Victor Metal Products Corporation and driven by Elbert Chambliss. The immediate result of the impact was; frame was bent, the bumper and back of the cab of the pick-up truck were damaged and the front end of the tractor-trailer truck skidded against the bank of a ditch on the right side of the road. Shirrell told a State Trooper, who arrived at the scene of the accident soon after it happened, that he was not hurt. Shirrell then walked up the road about a mile to make a telephone call. About four hours later (around 10 a.m.) he arrived home and told his wife he didn't think he was hurt, but she said she thought he appeared nervous. Shirrell then went with a neighbor to Alton, Missouri concerning the papers on his truck. He returned from this trip, ate lunch, and at 1 p.m. went to the store across the road which he and his wife operated. At that time he said "there is a funny feeling in my legs," and also said "Oh my back." Thereupon a neighbor, Mr. Hyde arranged to take him to Dr. William Carhart at Alton. Shirrell could not walk to the car but, as Mrs. Shirrell put it, they had to push his feet along or just scoot him along. The Doctor found him incoherent and partially paralyzed from the navel down, and gave him medication including aspirin. Shirrell was returned home and the next morning was put in a car for transportation to a hospital in Jonesboro. However when they arrived at Pocahontas he was unable to proceed on the journey. Dr. Carhart was contacted by phone and he advised they bring him to his office. This was done, and then he was taken back home where he was treated and died on January 17, 1957.

The testimony of Dr. Carhart was, in substance, as follows: On January 3, I saw Mr. Shirrell after he had been in an accident — he was unable to move his legs, complained of severe pains in his legs and told me he had been involved in an accident. His temperature was

98 degrees which is below normal. I X-rayed his skull, chest, abdomen, back and lower extremities. His particular complaint was inability to move and had no feeling from his waist down — his reflexes were normal but he did not react to electric stimuli, he did not notice an electric shock — he didn't feel it at all from his navel down, above the navel he did feel it — no reaction from the navel down, front, back or side. We used a sharp needle to penetrate the skin but there was no reaction to it below the navel but reaction above the navel. A urinalysis showed there was a little blood. Q. "Did you reach any conclusion in your examination of Mr. Shirrell?" A. "Yes, I did. I suspected traumatic psychoneurosis shock." Shirrell was mentally incoherent at moments when I first saw him — he kept speaking of the accident — at times he knew he was in my office and at times I don't think he did know exactly where he was. An examination of his heart and blood pressure showed blood pressure 145/81, pulse good, steady at 62 per minute, respiration good — blood pressure considered normal for a man of his age. My recommendations as to treatment were: Diet, medication, rest, rehabilitation, passive exercise of the body and extremities. The diet was to be liquids or fluids. In the way of medication, I used Thorazine, which is a tranquilizer, and I used aspirin. I recommended taking Mr. Shirrell to a hospital the next morning. The next day they started to take him to Jonesboro but when they got to Pocahontas Mr. Shirrell couldn't proceed any further and they stopped there and called me. I told her to keep him there. Mrs. Shirrell called me again in the evening and I told her to bring him up and he came back to my clinic the next morning. I saw Mr. Shirrell again on the 5th when he was brought in an ambulance to my clinic — I found his condition was progressively worse — he had the same trouble except it was worse and he complained of severe pain in his chest and skull at that time, it was more pronounced. He was incoherent and I called a specialist in Springfield. I repeated my examination of him and I concluded that he

had the same difficulties only he was worse. I advised Mrs. Shirrell that he should be moved to a hospital but she wanted him returned home — in my opinion there was nothing that could have been done at a hospital that couldn't have been done for him at home. I saw him at his home the next day on the 6th but I was in 24 hour contact with the Shirrell family. On the 6th there was no improvement — the same things were wrong with him and he was incoherent — he thought he was a little boy and he kept recalling facts that even the Shirrell family had forgotten. The next time on the 8th I found his condition the same — I didn't make any recommendations except to continue the treatment as prescribed. On the 8th Shirrell was complaining of severe pain in the chest and skull — the next time I saw him was on the 12th and his condition was unchanged, he was definitely incoherent and the case was marked critical and the family was so advised. He was in pain at the time because there was severe moaning and he would hold his head and skull, and the moaning was continuous. Next time was on the 14th and found no change — next time on the 16th and the patient was in a coma. On the 14th he was making sort of a crying noise and moaning, he died on the 17th. Shirrell was unable to control bladder and bowels during his sickness.

On cross-examination the doctor stated: "A person sick independent of wounds would demonstrate pathology if they were diseased. If a person had pneumonia they would demonstrate pathology to the lungs. Shirrell did not have pneumonia — I never changed my diagnosis — it was acute traumatic psychoneurosis shock. In explaining the doctor's statements he said: "Traumatic is caused or relating to an injury. Psychoneurosis is a functional condition, disorder of mental origin without benefit of clinical demonstration of a lesion, fracture or wound. You can't find a full definition of traumatic psychoneurosis shock in the dictionary. Trauma indicates some sort of a blow or an injury. Q. "Didn't this man have a mental condition?" A. "There was a possibility he could have." Q. "Why did you classify it as

psychoneurosis?" A. "Because he lost the value of reality." He was a psychoneurosis patient — there is such a thing as traumatic psychoneurosis — traumatic psychoneurosis would be an injury to the system, and we couldn't demonstrate any lesion, wound or pathology. *To link traumatic psychoneurosis together the trauma would come from the accident,* possibly unknown to Mr. Shirrell. *The truck hitting him from behind would possibly cause a mild whiplash injury to his system,* which he at the moment ignored. Whiplash injury is a blow and would be most generally without the knowledge of the victim, a blow from the back. *I suspicioned at the time Mr. Shirrell came to see me a whiplash injury but when I couldn't elicit any dislocation from the X-rays, I ruled that out.* Mr. Shirrell walked away from the accident and complained only later; then I was suspicious. There is a *possibility* that paralysis of the legs could have been caused by a mental condition, paralysis of the legs is an organic symptom.

On redirect the doctor stated: "I considered an injury to the vertebral column but not finding any external proof lacerations or marks we ruled that out. After hearing the testimony of Dr. Bean I have not changed my mind of the diagnosis of the trouble of this man. *For a man of normal health as Mr. Shirrell was, I would attribute his condition to an accident."*

The Dr. Bean mentioned above was called to testify for appellants. He is an Osteopathic Physician, well qualified. After all the facts and circumstances of this case were fairly placed before him in a lengthy hypothetical question, he was asked if there was any direct causal connection between the traffic accident and Shirrell's condition and death. His answer was: "My opinion is that it could have no bearing whatsoever since the lapse of time was 6 hours or a little bit better."

Assuming, though it is not made clear, Dr. Bean meant to say that in his opinion there was no connection between the accident and Shirrell's condition and death, it still leaves open a question for the jury. Dr. Car-

hart attributed Shirrell's condition to the accident, and Dr. Bean did not. The jury had the right not only to believe the one and disbelieve the other but to consider which doctor's testimony more nearly conformed to all the facts and circumstances of the case. Both doctors agree that Shirrell's symptoms and condition indicated some kind of an injury to or malfunction of the spinal cord. The jury could have believed this spinal cord condition was the result of the severe blow or whiplash especially in view of the absence of any other explanation. We recognize that appellee bore the burden of showing a causal connection, as stated in *Jonesboro Coca Cola Bottling Co.* v. *Young,* 198 Ark. 1032, 132 S. W. 2d 382 and other decisions of this court, but this again, involved a question of evidence and the weight to be given it by the jury.

Appellants cite *Missouri Pacific Railroad Co.* v. *Hampton,* 195 Ark. 335, 112 S. W. 2d 428 for the rule that where the evidence is uncertain, and two or more things might have brought about the injury, there can be no recovery. This is merely another way of saying, as this court has said many times, that a jury's verdict must be based on evidence and not on speculation, and it does not, we think, preclude a recovery here. Here there are, as heretofore pointed out, many facts and circumstances together with the positive statement of Dr. Carhart pointing to the conclusion reached by the jury. On the other hand there is no evidence that any thing else might have caused the injury to Shirrell's spinal cord.

*Two.* We cannot say there is no substantial evidence to support the jury's verdict for pain and suffering in the amount of $20,000. The testimony relating to this feature of the case has already been set forth and it would serve no useful purpose to repeat it. There is, as we have said on many occasions previously, no definite or satisfactory rule to measure compensation for pain and suffering. Where there is substantial evidence to support the jury's verdict, as we believe there is here, and there is nothing in the case to indicate passion, prej-

udice, or an incorrect application of the law, as in the case here, this court will not disturb the award of the jury. See: *Coca Cola Bottling Co.* v. *Cordell,* 189 Ark. 1132, 76 S. W. 2d 307, *Arkansas Motor Coaches* v. *Williams,* 196 Ark. 48, 116 S. W. 2d 585, and *Rudolph* v. *Mundy,* 226 Ark. 95, 288 S. W. 2d 602.

It follows from what we have said that the judgment of the trial court must be affirmed.

*Cross-Appeal.* The jury found that 25 per cent of the total negligence was attributable to Shirrell, from which finding appellee has cross-appealed. We are unable to say the jury was wrong as a matter of law. We find in the record substantial evidence to support the jury's verdict. The evidence discloses that it was dark when the pick-up truck was hit from behind by the tractor-trailer truck driven by Chambliss. Chambliss testified that if Shirrell had a tail light on his pick-up it was not burning or he could not see it. He also stated that he told Shirrell this and that Shirrell stated it (the tail light) had been in the habit of going out. None of the testimony is denied or refuted, and is, we think, substantial evidence of negligence.

Affirmed on direct appeal and on cross appeal.

McFADDIN, J., not participating.