ST. PAUL FIRE & MARINE INSURANCE CO.
*v.* Opal BRADY, Special Administratrix
of the Estate of Vird E. Brady

92-614 891 S.W.2d 351

Supreme Court of Arkansas
Opinion delivered January 23, 1995

*Friday, Eldredge & Clark*, by: *Laura Hensley Smith, Sarah J. Heffley*, and *David D. Wilson*, for appellant.

*David Hodges*, for appellee.

JACK HOLT, JR., Chief Justice. St. Paul Fire & Marine Insurance Company appeals from a judgment in a medical negligence action in favor of appellee Opal Brady, special administratrix of the estate of her late husband, Vird E. Brady. Mrs. Brady cross-appeals.

The following points form the basis of St. Paul's appeal:

> I. Whether the trial court erred in failing to direct a verdict on the issue of sufficiency of the medical evidence of proximate causation of injury and death;

> II. Whether the trial court erred in failing to direct a verdict on the issue of negligence;

> III. Whether the trial court erred in failing to grant a motion *in limine* to preclude any discussion at trial regarding post-incident meetings with hospital administrators.

As we reverse and dismiss the matter on the first issue argued by St. Paul, we need not consider the other points on appeal, and we dismiss the cross-appeal without further discussion.

*Facts*

Vird E. Brady was an 81-year-old man who resided near Enola in Faulkner County. He suffered from various medical problems, including emphysema, recurring pneumonia, chronic obstructive lung disease, Parkinson's disease, and atrophy of the brain resulting in senile dementia.

In 1988, when Dr. Bart Throneberry became his treating physician, Mr. Brady was in an unresponsive state and had to be fed by a tube. Following hospitalization in February and March 1988, Mr. Brady was maintained at home with the use of a hospital bed, visiting nurses, pureed food, and supplemental oxygen. His condition gradually improved to the point where, on May 10, 1988, he was able to attend a ball game and walk half a mile to his son's house.

The next day, May 11, 1988, as Mr. Brady was reaching for a shirt while getting dressed, he fell on the floor. Mrs. Brady was unable to get him up and called her son, Charles Brady, to come to the house and assist her. After the two got Mr. Brady on his feet, he ate a big breakfast. Later, Mrs. Brady, who had been concerned about her husband sleeping excessively for the past two or three days, phoned Dr. Throneberry to schedule an appointment. She stated at trial that she didn't mention the "little fall."

That afternoon, Mrs. Brady took her husband to Dr. Throneberry's office in Conway and told him about the fall and a "little red place" on Mr. Brady's head. Dr. Throneberry noted a bruise over the left temple. He ordered a CT scan of Mr. Brady's brain to be performed at Conway Regional Hospital to determine whether there was damage resulting from the fall or from a stroke.

The Bradys immediately went to the hospital, arriving there at about 3:00 p.m. A nursing assistant, Peggy Earnhart, took Mr. Brady in a wheelchair to the x-ray department for the CT scan. After delivering Mr. Brady to the x-ray department, Ms. Earnhart remained with him for a few minutes until the x-ray technician, Carol Hill, arrived. Ms. Hill asked Ms. Earnhart to "wait a minute" and, explaining that it would take a few minutes for the machine to warm up, went into the CT scan room to attend to preparations and paperwork. Ms. Earnhart, however, left because her shift had just ended and she was off duty.

Mr. Brady remained in the wheelchair, unattended. As she was leaving, Ms. Earnhart testified, she asked Mr. Brady to stay in the wheelchair, and, she said, "He nodded his head 'Yes.'" After clocking out and retrieving her purse, Ms. Earnhart passed by the x-ray department and noticed that Mr. Brady was still alone. A short time later, Ms. Hill returned to take Mr. Brady into the CT room and discovered him lying unconscious in a pool of blood on the floor several feet away from his wheelchair.

A radiologist and an emergency-room physician were called to examine Mr. Brady. His vital signs were stable, and, after a telephone consultation with Dr. Throneberry, it was decided to continue with the CT scan. Afterward, Mr. Brady was returned, with a bruised face and still unconscious, to his room, where Mrs. Brady had been waiting for an hour and a half with no word concerning her husband's condition. She received no explanation from hospital personnel until she went to the nurses' station and was informed that someone had called from the x-ray department and had said that there had been an accident.

The CT scan revealed that Mr. Brady had suffered a brain hemorrhage. Dr. Throneberry ordered that he be transferred to the care of a neurosurgeon at St. Vincent Infirmary Medical Center in Little Rock. When it was determined that surgery would not be necessary, Mr. Brady was transferred back to Conway Regional Hospital, where he remained until his death on July 20, 1988, some seventy days after his falls at home and at the hospital.

On February 17, 1989, Mrs. Brady filed suit in the Faulkner County Circuit Court against St. Paul Fire & Marine Insurance Company, liablity carrier for Conway Regional Hospital, which, as a non-profit organization, was immune from civil liability. The complaint alleged that the agents, servants, and employees of the Conway Regional Hospital were guilty of negligence, which was a proximate cause of the injuries and resulting death of Mr. Brady.

Following a jury trial, a verdict was rendered in favor of Mrs. Brady. Damages were awarded as follows: Estate of Vird E. Brady — $50,000; Mrs. Opal Brady — $40,000; Ann Holland (daughter) — $4,000; Charles Brady — $4,000. St. Paul filed a motion for judgment notwithstanding the verdict, which

the trial court granted, reducing the estate's $50,000 award to $2,300. Counsel for Mrs. Brady then filed a motion to amend the order, explaining to the court that the evidence at trial of funeral expenses was actually $4,300. Subsequently, the trial court corrected its ruling to reflect an award to the estate of $4,300.

### Proximate cause of injury and death

 The only issue that we consider in this appeal is St. Paul's argument that the trial court erred in denying the defense's motion for a directed verdict on the issue of proximate causation as there was no substantial evidence that the cause of injury and death was related to any act or omission by hospital employees. The test for the trial court in ruling on a motion for a directed verdict is to take that view of the evidence that is most favorable to the non-moving party and to give it its highest probative value, taking into account all reasonable inferences deducible from it; after viewing the evidence in this manner, the trial court should (1) grant the motion only if the evidence is so insubstantial as to require that a jury verdict for the non-moving party be set aside, or (2) deny the motion if there is substantial evidence to support a jury verdict for the non-moving party. *Young* v. *Johnson*, 311 Ark. 551, 845 S.W.2d 509 (1993). Substantial evidence is evidence of sufficient force and character to compel a conclusion one way or the other. It must force or induce the mind to pass beyond suspicion or conjecture. *Id.*

To resolve this issue, we focus on whether there was substantial evidence to support the view that the second fall at the hospital on May 11, 1988, rather than an aneurysm or the first fall at home, was the proximate cause of Mr. Brady's brain injury, unconsciousness, and, ultimately, death. According to St. Paul, the only evidence concerning the cause of the brain injury was presented in the form of lay circumstantial testimony from family members. This evidence, St. Paul contends, merely amounted to anecdotal statements that Mr. Brady seemed very alert and responsive to his wife and son before he went to the hospital and that he was in a coma when, later in the day, they saw him again.

 Of course, proximate cause may be proved by either circumstantial or direct evidence. *Cockman* v. *Welder's Supply Co.*, 265 Ark. 612, 580 S.W.2d 455 (1979). It is, however, necessary

that there be evidence that would tend to eliminate other causes that may fairly arise from the evidence and that the jury not be left to speculation and conjecture in deciding between two equally probable possibilities. *McAway* v. *Holland,* 266 Ark. 878, 599 S.W.2d 387 (Ark. App. 1979). That factor is crucial with regard to this issue.

The jury had before it evidence supplied by Opal Brady and Charles Brady that, after the first fall at home, Vird Brady was alert and, once lifted to his feet, capable of moving on his own. For approximately nine hours after the first fall, according to Mrs. Brady, her husband was conscious and responded to questions. Moreover, although he was somewhat lethargic, Mr. Brady nonetheless "seemed a little stronger" to his wife after the fall at home.

Further, Dr. Throneberry testified that, while Mr. Brady "seemed weaker" and mumbled when he examined him, no neurological changes could be detected. He noted a small bruise over the left temple, which he assumed resulted from the first fall. He stated that he ordered a CT scan because Mr. Brady had fallen at home, had a bruise over his temple, and exhibited a sudden change in his condition. Dr. Throneberry did not order restraints because he believed them to be unnecessary, though he indicated that leaving Mr. Brady alone for more than five minutes would be "getting away" from a reasonable amount of time.

Nurse Earnhart stated that Mr. Brady responded when she spoke to him on his arrival at the hospital, that he did not seem to be in a confused state, and that she could see no signs of injury "on him or about his head." She testified that she didn't believe that anyone needed to watch out for Mr. Brady and that when she passed by on her way out a few minutes afterward "he was in the wheelchair in the same position he was when I left him." According to Ms. Earnhart, Mr. Brady could have undone a restraint if one had been placed on him.

Regarding the fall at the hospital, some evidence was presented concerning the severity of the second fall. Mr. Brady was discovered lying face down in a pool of blood, unconscious, in a hospital corridor. Photographs taken after the second fall were introduced showing Mr. Brady's face bruised and swollen, with a laceration on the forehead. Charles Brady testified that, after

the second fall, Mr. Brady "did not respond to anything." It was established that the first fall occurred on a carpeted floor, while the second fall happened in a non-carpeted, hard-surface area.

Dr. Keith Bell, a radiologist who was in charge of the CT scan performed on May 11, 1988, noted that the procedure revealed that, in addition to atrophy (involving loss of brain tissue through probable multiple small strokes which had been evident in earlier CT scans), Mr. Brady had a blood clot that had accumulated at the base of the brain stem on the right. When Dr. Bell first detected the presence of a blood clot, he thought that the location was "an unusual place for someone to get a blood clot if they have had a trauma" and believed that the clotting was more consistent with Mr. Brady having sustained an aneurysm.

A blood clot or mass in this area would not have to become too large, he stated, in order to cause the patient to become comatose or to die. Because the area was small, Dr. Bell remarked, "it is possible for the bleed to have occurred slowly over a period of time." On cross-examination, however, he acknowledged that, due to the small area involved, the symptoms could appear "quicker."

In sum, Dr. Bell further testified that the blood clot could have been caused by either fall and that "[i]t would be pure speculation for me to state which fall, if either, caused this injury." The actual mechanism of the injury, Dr. Bell explained, was the shifting of the brain within the skull and not the impact itself. The shifting causes a tear in small veins that subsequently bleed at either a slow or rapid rate. According to Dr. Bell, a slow bleed would produce subtle symptoms over a period of time before the person would finally pass out. He stated that he had no reason to believe that there had been a fast accumulation of blood.

Dr. Throneberry's testimony is of no consequence as he stated that he did not know whether Mr. Brady's brain injury was caused by the fall at home or the fall at the hospital. He asserted that it was outside the range of his expertise to say which fall caused the injury.

A case cited by St. Paul regarding proximate cause of death, *McAway* v. *Holland, supra,* is apposite. In *McAway,* a person who had been in an automobile accident four weeks earlier and who

no longer had "any get-up-and-go" suddenly died four weeks later. The Arkansas Court of Appeals affirmed the trial court's finding that the death was not proximately caused by the accident, observing that lay testimony on cause of death is unacceptable and that:

> There is no circumstantial evidence — even the most scant — which suggests a causal connection between the accident and death. The mere fact both happened about a month apart proves nothing. If there had been some evidence of causal connection maybe the lay testimony might have been slight corroboration. However, standing alone it is nothing. . . .

266 Ark. at 883, 599 S.W.2d at 390.

■ To recapitulate, neither Dr. Bell nor Dr. Throneberry could say that either fall caused Mr. Brady's injury or death. Dr. Bell, as noted earlier, outlined three possible scenarios — (1) an aneurysm; (2) the first fall at home; and (3) the second fall at the hospital — and emphasized that a conclusion on his part concerning the cause of injury would be purely speculative. Dr. Throneberry explained that a decision regarding which fall caused the injury was beyond the bounds of his expertise. All that remained, then, was anecdotal information from a variety of witnesses. The jury, with nothing but uncorroborated lay testimony on which to rely, was left to wander in a maze of speculation and conjecture. We hold that the trial court erred in refusing to direct a verdict in favor of St. Paul on causation.

■ This court would be remiss in its responsibility if it failed to take note of the abstracting abuses by counsel for Mrs. Brady. The supplemental abstract filed on October 29, 1992, by counsel for Mrs. Brady as appellee consists of 120 single-spaced pages of pleadings and a pre-trial hearing transcript copied verbatim from the record rather than condensed in compliance with Sup. Ct. R. 4-2(a)(6). As we noted in *Forrest City Machine Works, Inc.* v. *Mosbacher*, 312 Ark. 578, 587, 851 S.W.2d 443, 448 (1993), a case in which much of the abstract consisted of a single-spaced, verbatim retyping of the record, "excessive abstracting is as violative of our rules as omissions of material pleadings, exhibits, and testimony." Although some of the information thus provided in the present case was material, much of it could have

been abridged in accordance with the rule or simply deleted without compromising its materiality. With so lengthy a record as that presented here, this court's efforts to reach a final resolve would have been aided considerably by scrupulous adherence to Rule 4-2(a)(6), which provides that

> [t]he appellant's abstract of abridgment of the record should consist of an impartial condensation, without comment or emphasis, of *only* such material parts of the pleadings, proceedings, facts, documents, and other matters in the record as are necessary to an understanding of all questions presented to the Court for decision.

(Emphasis in original.)

Appeal reversed and dismissed.

Cross-appeal dismissed.

BROWN, J., dissents.

ROAF, J., not participating.

ROBERT L. BROWN, Justice, dissenting in part, concurring in part. This appeal concerns what caused Mr. Brady's blood clot which led to his death. In my judgment, substantial proof was introduced to support a jury finding that the second fall was the proximate cause. The majority opinion states that no *conclusion* was reached by a medical doctor on the cause of Mr. Brady's blood clot. But a medical conclusion concerning causation is not required for the matter to go to the jury. Here, Dr. Bell's initial opinion was that trauma from one of the two falls "most likely" caused the blood clot. That testimony coupled with testimony from three witnesses concerning Mr. Brady's condition before and after the second fall remove any bona fide suspicion that the verdict was premised on speculation.

As the majority states, the boilerplate law regarding the required proof is clear. The evidence of causation must be substantial, which means that it must pass beyond suspicion and conjecture and compel a conclusion one way or the other. *Hall v. Grimmett*, 318 Ark. 309, 885 S.W.2d 297 (1994). Time and again we have said that that evidence must be viewed in the light most favorable to the appellee, in this case the Brady Estate, and given its *highest* probative value taking into account all reason-

able inferences deducible from it. *Id.* When that is done, the Brady Estate must prevail.

Dr. Keith Bell, the treating radiologist for Mr. Brady, testified for St. Paul and was questioned on direct examination about the cause of the blood clot:

> Q. And what was that opinion? What crossed your mind when you saw that CT Scan?
>
> A. Well, as I mentioned earlier, the first thing that crossed my mind was the possibility of an aneurysm that ruptured. It's not unfrequent (sic) — or infrequent to see patients come over who-the only history we have is that they've fallen, and you do the scan and you find they've ruptured an aneurysm or they've had a stroke or any number of other things that could cause a person to fall. So that was the first thing that went through my mind. And I also considered the fact that it could well be caused from his trauma either that morning or from the fall that he had just sustained.

In short, Dr. Bell testified on direct examination that there was a medical basis for Mr. Brady's blood clot, it having been caused by either an aneurysm or a fall. That is far different from testimony that the cause of the blood clot was open completely to speculation.

On cross-examination by counsel for the Estate, Dr. Bell admitted that his original opinion was that the cause of the blood clot was most likely the result of a blow to the head as opposed to an aneurysm. Reading from Dr. Bell's medical report, counsel for the Estate inquired:

> Q. Now you did render an opinion as to what caused this blood clot, didn't you?
>
> A. I did.
>
> Q. And if the jury can look at it, it's what? [t]he third, fourth line down starting there, where it says under "Impression," Dr. Bell, it says, "I believe this is most likely related to trauma with contusion of the brain against the tentorium, possibly tearing a small vein in this area; is that correct?"

A. That's correct.

Thus, it is beyond dispute that on the date of the fall, May 11, 1988, Dr. Bell concluded in his medical report after the CT scan that trauma to the head *most likely* caused the bruising of the brain and the bleeding.

Then there are Dr. Bart Throneberry's progress notes on Mr. Brady the day of the two falls. After the first fall at home, Dr. Throneberry saw Mr. Brady in his office. He described him in his notes as "mumbling, confused, very weak and ataxic. PT did answer simple questions." A CT scan was ordered.

After the second fall at the hospital, Dr. Throneberry's notes reveal that he found Mr. Brady with his "eye swollen shut" and a small laceration on his eyebrow, conditions, which he emphasized by underlining, that had not been present during his office visit. He added that Mr. Brady was "responsive only to pain."

After the second fall and the CT scan, Mr. Brady was ordered to St. Vincent Infirmary in Little Rock in an ambulance. The paramedic's notes show him as unconscious and unresponsive to verbal or pain stimulation. At St. Vincent Infirmary, Dr. David Reding made progress notes on the same day of the fall that Mr. Brady had an "intracerebral bleed" and was "unresponsive" and that he had "no speech" and showed a "fresh" hemorrhage around the midbrain. The outlook was "guarded." The records at St. Vincent Infirmary also stated that Mr. Brady had been in the hospital for a CT scan two months earlier in March and that there was "no definite aneurysm."

In addition to the medical testimony, there was the testimony of the widow, Opal Brady, and the son, Charles Brady, at trial. Both testified that before the fall in the hospital Mr. Brady was awake and responsive and after the fall, he was unconscious. Mr. Brady remained virtually unconscious until his death.

In sum, although there was no specific medical testimony that the second trauma to the head caused the blood clot, there was certainly medical proof that trauma was the proximate cause of the clot. This was followed and supplemented by testimony of how Mr. Brady looked and reacted before and after the hospital fall. That testimony came from Dr. Throneberry and Opal Brady and Charles Brady and militated in favor of a conclusion that

Mr. Brady's condition was significantly worse after the second fall. He was found in a pool of blood, and his eye swelled shut after the second trauma. He was then rushed to St. Vincent Infirmary. He never regained full consciousness after the second fall. The evidence supporting a conclusion that the second fall caused the blood clot was manifestly substantial, especially when viewed in a light most favorable to the Estate and giving that evidence the highest probative value.

This is not a case where the jury was left to speculate between two equally probable causes. *See Hill* v. *Maxwell*, 247 Ark. 811, 448 S.W.2d 9 (1969). It is a case where the proof preponderates in favor of the Estate's theory of causation. This case was decided by a jury, as fact finder, and should have been as the determination of causation is ordinarily an issue of fact. *See Stacks* v. *Arkansas Power & Light Co.*, 299 Ark. 136, 771 S.W.2d 754 (1989); *Curbo* v. *Harlan*, 253 Ark. 816, 490 S.W.2d 467 (1973); *Chambliss* v. *Brinton*, 229 Ark. 526, 317 S.W.2d 143 (1958). I respectfully dissent from the decision to reverse on this ground.

I agree, however, with the majority's decision to dismiss the cross-appeal for violation of Supreme Court Rule 4-2(a)(6).