James ARTHUR, M.D., and Allan C. Gocio, M.D. *v.*
Betty Jo ZEARLEY and Herman Zearley

98-156 992 S.W.2d 67

Supreme Court of Arkansas
Opinion delivered March 25, 1999

*Friday, Eldredge & Clark*, by: *J. Phillip Malcom* and *Robert S. Shafer*, for appellants.

*Hicks Law Firm*, by: *George R. Wise, Jr.*, for appellees.

ANNABELLE CLINTON IMBER, Justice. This is the second appeal in this medical malpractice case.[1]

The appellants challenge the trial court's denial of their motion for a directed verdict and they contest certain evidentiary rulings by the trial court. They also contend that the trial court

---

[1] In the first appeal, we reversed the trial court's class certification order and remanded the case to the trial court for decertification. *Arthur v. Zearley*, 320 Ark. 273, 895 S.W.2d 928 (1995).

erroneously instructed the jury on certain elements of damages. We affirm on the first two points, but reverse and remand for a new trial on the third point, based on our holding that the trial court erred in instructing the jury that damages could be awarded for lost future earnings, loss of ability to earn in the future, and future medical expenses.

The appellants, Dr. James Arthur and Dr. Allan C. Gocio, are neurosurgeons practicing at the Hot Springs Neurosurgery Clinic. Mrs. Betty Zearley sought treatment from Dr. Arthur in May, 1991, for pain related to a neck injury she sustained in a car accident. Dr. Arthur recommended an anterior cervical diskectomy and fusion surgery ("ACF surgery") to alleviate Mrs. Zearley's pain. ACF surgery is used to treat pain resulting from disc material impinging upon the cervical spine. The surgery involves removing the disc material and replacing it with a graft which is supposed to maintain the disc space while the body forms new bone between the vertebrae, thereby fusing them together. The most common graft materials used in ACF surgery are bone taken from the iliac crest of the patient's hip ("autologous bone" or "autograft") or donor bone taken from a cadaver ("allograft"). The use of either type of graft material carries certain risks. Specifically, when donor bone is used, there is a risk of transmission of disease, and when the patient's own bone is used, there is an increased risk of infection and pain at the graft site.

Neither of these graft materials was used by Dr. Arthur when he performed the ACF surgery on Mrs. Betty Zearley. Rather, he informed Mrs. Zearley that he would use a white ceramic spacer as graft material and insert it into her spine. The ceramic spacer was a product called "Orthoblock." Orthoblock is a dense form of hydroxylapatite, a ceramic material developed to replace bone in maxillofacial (dental) surgeries, that is manufactured by Calcitek, Inc. Orthoblock was not designed by the manufacturer or approved by the Food and Drug Administration ("FDA") for use in the human spine. The package insert accompanying Orthoblock warned that it should not be "used in any position where the implants are likely to sustain significant tensile, flexural, or sheer forces during function" and that aggressive contouring of

the material could cause "brittle failure resulting in cracking or breaking of the implant."

According to Dr. Gene Bolles, an expert witness for the Zearleys, the information contained in the Orthoblock package insert did not support its use in the human spine. He further testified that there was no scientific basis for performing ACF surgery with Orthoblock and that Orthoblock could actually act as an "anti-fusion" device, so as to prevent fusion. However, Dr. Arthur testified that he had a firm scientific basis for performing Mrs. Zearley's surgery with Orthoblock. First, he relied upon an article published in 1989 in a medical journal that described the use of Orthoblock in ACF surgery and favorably compared the results from that type of surgery with the results from surgery using autograft or allograft material. Second, he had performed eighty to ninety procedures with Orthoblock between 1989 and May, 1991, when Mrs. Zearley came to him for treatment.

With regard to Dr. Arthur's disclosures before the surgery, Mrs. Zearley testified that he showed her the Orthoblock material and told her that he and Dr. Gocio had good results using it in ACF surgery. However, Mrs. Zearley testified that he did not tell her that Orthoblock had not been designed by the manufacturer, or approved by the FDA, for use in the human spine. She also testified that Dr. Arthur did not tell her that there were other alternatives (hip or bone bank bone) or that the use of Orthoblock in ACF surgery was experimental. Dr. Arthur, on the other hand, testified that he told Mrs. Zearley about all of the alternatives and that Orthoblock, although originally developed for dental surgery, was comparable to bone from the hip, based upon his own fairly significant experience with the product over the past two years and based upon findings by a group of doctors that had been published in 1989.

When Dr. Arthur, assisted by Dr. Gocio, performed Mrs. Zearley's surgery on May 28, 1991, he did not consider it to be experimental surgery, and, thus, saw no reason to seek approval from the hospital's review board. This assessment by Dr. Arthur was refuted by the deposition testimony of Dr. George Allen. He testified that the surgery was experimental and should have under-

gone peer review by the hospital's review board. He also testified that no documented informed consent was obtained by Dr. Arthur before he performed the experimental surgery on Mrs. Zearley.

Mrs. Zearley testified that she continued to experience pain after the surgery. She returned to Dr. Arthur in June and August of 1991 for post-operative check-ups, and related her complaints to Dr. Arthur. Finally, in March of 1993, Mrs. Zearley learned from a newspaper article that Dr. Arthur had been sued for using Orthoblock in spinal surgery. After further investigation, she and her husband, Mr. Herman Zearley, filed this action on June 24, 1993, against the appellants, the Hot Springs Neurosurgery Clinic, St. Joseph's Regional Health Center, Inc. (St. Joseph's Hospital), and Calcitek. *Zearley I, supra.* The Zearleys alleged medical negligence, battery, fraud, outrage, strict liability and breach of warranty and sought compensatory and punitive damages.[2]

Shortly after filing suit, Mrs. Zearley contacted Dr. Edward Saer, an orthopedic surgeon in Little Rock, about further treatment of her neck. On June 16, 1993, Dr. Saer performed a revision ACF surgery on Mrs. Zearley, removing the Orthoblock spacers and then replacing them with bone taken from Mrs. Zearley's hip. Dr. Saer testified that Mrs. Zearley's condition improved significantly after the revision surgery. Mrs. Zearley agreed with Dr. Saer's assessment when she testified that she was "back to normal" after the revision surgery.

At trial, over a relevancy objection by the appellants, the Zearleys read portions of Dr. Arthur's deposition in which he testified that all of his patients knew that Orthoblock was not designed or FDA-approved for use in the human spine. Over further objection by the appellants, the Zearleys called three other Orthoblock patients to testify about their own informed consent conferences with Dr. Arthur before surgery. These witnesses testified that Dr. Arthur never informed them that the Orthoblock

---

2 On June 9, 1994, the Zearleys amended their complaint to request class certification and added American Medical International d/b/a National Park Medical Center ("AMI") as a defendant. *Zearley I, supra.* After this case was remanded from the class certification appeal, the Zearleys dismissed their claims against Calcitek and AMI.

was not designed or FDA-approved for use in the human spine. At the conclusion of their testimony, the appellants moved for a mistrial, which motion was denied by the trial court.

At the close of the Zearleys's case-in-chief, the trial court dismissed their claims for battery, fraud, and the tort of outrage. However, the motion for a directed verdict by the appellants based on insufficient evidence of proximate cause was denied by the trial court. The trial court also overruled their objection to the damages instruction based on insufficient evidence of future damages.

The jury returned a verdict in favor of Betty Zearley and against the appellants, and awarded compensatory damages in the amount of $115,000.00. The jury also returned a verdict in favor of Herman Zearley on his claim for loss of consortium in the amount of $15,000.00. The jury rejected the Zearleys's claim for punitive damages against the appellants. The jury also rejected the Zearleys's claim against St. Joseph's Hospital. Appellants bring this appeal from the trial court's entry of final judgment on the jury's verdict.

## I. Proximate Cause

For their first point, the appellants argue that the evidence was insufficient to establish that the use of Orthoblock in Mrs Zearley's first surgery was the proximate cause of her injuries, and that the trial court erred in refusing to grant their motion for a directed verdict.

When considering a motion for directed verdict made by a defendant, the plaintiff's evidence, and all reasonable inferences therefrom, are examined in the light most favorable to the plaintiff. *Dodson v. Charter Behavioral Health Sys., Inc.*, 335 Ark. 96, 983 S.W.2d 98 (1998); *Avery v. Ward*, 326 Ark. 830, 934 S.W.2d 516 (1996). A directed-verdict motion should be granted only if the evidence would be so insubstantial as to require a jury verdict for that party to be set aside; evidence is insubstantial when it is not of sufficient force or character to compel a conclusion one way or the other, or if it does not pass beyond mere suspicion or conjecture. *Dodson, supra; City of Little Rock v. Cameron*, 320 Ark.

444, 897 S.W.2d 562 (1995); *St. Paul Fire & Marine Ins. Co. v. Brady*, 319 Ark. 301, 891 S.W.2d 351 (1995).

The appellants argue that neither the medical expert testimony nor any other evidence presented in the case established that Mrs. Zearley's injuries were caused by the use of Orthoblock. In support of this argument, appellants focus on Mrs. Zearley's declaration that she would not "have allowed it [Orthoblock] to be put in my spine," if she had known it was experimental and not designed or FDA-approved for use in the spine. The appellants suggest that this declaration was insufficient to prove proximate cause for two interrelated reasons. First, they assert Mrs. Zearley did not say she would not have undergone ACF surgery at all if she had been fully advised of the facts concerning Orthoblock, but only that she would not have consented to the use of Orthoblock as a graft material. Second, they assert that Mrs. Zearley faced the same risk of lack of fusion (pseudo-arthrosis) in any ACF surgery, regardless of the graft material used, and that the Zearleys failed to present substantial evidence that Mrs. Zearley's injuries were anything more than the actualization of risks associated with any ACF surgery. In a nutshell, the appellants contend that the Zearleys failed to prove that Mrs. Zearley's injuries were linked solely to the use of Orthoblock and were not the result of risks commonly associated with other graft materials.

■ ■ Causation is ordinarily a fact question for the jury to decide. *First Commercial Trust Co. v. Rank*, 323 Ark. 390, 915 S.W.2d 262 (1996); *Catlett v. Stewart*, 304 Ark. 637, 804 S.W.2d 699 (1991). The law requires more than a mere possibility that certain injuries resulted from negligence; rather, a reasonable probability must be established. *Davis v. Kemp*, 252 Ark. 925, 481 S.W.2d 712 (1972). Therefore, a plaintiff's proof of causation must be more than speculation or conjecture. *Hill v. Maxwell*, 247 Ark. 811, 448 S.W.2d 9 (1969). It must be such that reasonable persons might conclude that it is more probable than not that an event was caused by the defendant. *Id.* Proximate cause may be shown from circumstantial evidence, and such evidence is sufficient to show proximate cause if the facts proved are of such a nature and are so connected and related to each other that the

conclusion may be fairly inferred. *Wheeler v. Bennett,* 312 Ark. 411, 849 S.W.2d 952 (1991).

As previously stated, we examine the evidence, and all reasonable inferences therefrom, in the light most favorable to the plaintiff. *Dodson, supra.* Dr. Saer's testimony is particularly relevant to the causal link between Mrs. Zearley's injuries and the use of Orthoblock. Mrs. Zearley sought treatment from Dr. Saer two years after the original surgery by Dr. Arthur. According to Dr. Saer, the x-rays of Mrs. Zearley's spinal column showed that the Orthoblock spacer used at C5-6 was broken and that the one used at C6-7 was not fused. He testified that there was solid bony fusion after the revision surgery on June 16, 1993, and that Mrs. Zearley was "significantly better" the last time he saw her on June 15, 1994. He further testified that "it's kind of an internal control, if you look at it that way, yes, sir. She had not achieved a solid fusion at C6-7, approximately, two years after her original surgery and it appeared that she had a solid fusion in six months after the re-operation and certainly a year after the re-operation." Dr. Saer noted that he prefers to use the patient's own bone as a graft material because the failure-to-fuse rate is low for such bone. In Dr. Saer's experience, it would be unusual to revise an ACF procedure that's been done with bone, with the percentage of such revisions being in the less than five percent range. In contrast, Dr. Saer testified that the number of revisions for Orthoblock surgeries was unusual and that he had not seen anything like that as far as revisions for anterior cervical fusions. Evidence of causation was also provided by an expert witness for the appellants, Dr. Richard Saunders. He testified that removing the Orthoblock and replacing it with bone was a test which indicated that the removal of the Orthoblock from Mrs. Zearley's spine eliminated her pain.

Finally, Mrs. Zearley's own testimony is significant with regard to the causal connection between her injuries and the use of Orthoblock. Mrs. Zearley testified that she had to lie down most of the time while the Orthoblock was in her spine, and that she could not stand for long periods of time without constant pain. This testimony was consistent with the package insert warnings that Orthoblock should not be used where it was likely to

sustain significant tensile, flexural, or sheer forces. With regard to her condition after Dr. Saer's surgery, Mrs. Zearley testified that there was no comparison between how she felt two years after Dr. Arthur's surgery and how she felt eighteen months after Dr. Saer's surgery: "I was basically normal 18 or 19 months after Dr. Saer's surgery."

█ Based upon this testimony by Dr. Saer, Dr. Saunders, and Mrs. Zearley, we conclude that the evidence was of sufficient force or character to enable the jury to determine, without resort to speculation or conjecture, that Mrs. Zearley's injuries were proximately caused by the use of Orthoblock in the first ACF surgery.

█ We note that the appellants rely upon *Aetna Casualty & Surety Co. v. Pilcher*, 244 Ark. 11, 424 S.W.2d 181 (1968), in which we stated:

> In view of the undisputed testimony that this germ could have entered Gary in so many ways and from so many sources, and in view of the unchallenged difficulty in controlling it, we must conclude that the jury verdict must have been based on speculation and not on substantial evidence.

The appellants suggest that since the risk of infection could not be eliminated by the hospital in *Aetna,* so the risk of pseudo-arthrosis could not be eliminated for Mrs. Zearley. However, the cited holding in *Aetna* was qualified by the following language:

> This conclusion is confirmed by the fact that there is no expert testimony showing St. Vincent was negligent. In many cases the courts have held, in a case of this kind, that expert testimony has great weight where there is no direct proof to the contrary.

*Aetna, supra.* Thus, *Aetna* is inapposite because here we have expert testimony showing that Dr. Arthur was negligent. Furthermore, both Dr. Saer and Mrs. Zearley testified that her condition significantly improved after the revision surgery using bone from the hip. Dr. Saer also compared the results of each surgery: lack of fusion two years after the surgery with Orthoblock, but solid fusion within six months after the revision surgery with bone. This "internal control," or test, was confirmed by appellants's own expert witness, Dr. Saunders, when he acknowledged

that the removal of the Orthoblock eliminated Mrs. Zearley's pain. This evidence sufficiently linked Mrs. Zearley's injuries to the use of Orthoblock. Thus, we hold that there was substantial evidence to establish that Mrs. Zearley's injuries resulted from the use of Orthoblock, and we affirm the trial court's denial of the motion for a directed verdict by appellants.

## II. Evidentiary Rulings

For their second point on appeal, the appellants contest several of the trial court's evidentiary rulings. A trial court is accorded wide discretion in evidentiary rulings, and will not be reversed on such rulings absent a manifest abuse of discretion. *Skiver v. State*, 336 Ark. 86, 983 S.W.2d 931 (1999); *Miskelley v. State*, 323 Ark. 449, 915 S.W.2d 702 (1996).

First, the appellants assert that the trial court improperly admitted Dr. Arthur's deposition testimony that all of his patients knew that Orthoblock was not designed or FDA-approved for use in the human spine and that he told all of his patients that Orthoblock could fracture and migrate after it was in place. In support of this argument, the appellants contend that Dr. Arthur was present at trial and was ready and able to testify, and that his deposition testimony was not relevant.

Evidence is relevant if it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Ark. R. Evid. 401. A trial court's ruling on relevancy is entitled to great weight and will not be reversed absent an abuse of discretion. *Skiver, supra; Miskelley, supra; Dixon v. State*, 311 Ark. 613, 846 S.W.2d 170 (1993). Relevant evidence may only be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. *see* Ark. R. Evid. 403; *see also Gruzen v. State*, 267 Ark. 380, 591 S.W.2d 342 (1979); *Potter v. Magee*, 61 Ark. App. 112, 964 S.W.2d 412 (1998).

 Deposition testimony by Dr. Arthur concerning what he told all of his patients during their informed consent conferences was relevant and admissible under Ark. R. Evid. 406 as evidence of Dr. Arthur's habit and routine in obtaining informed consent from all of his patients. *See Hall v. Arthur,* 141 F.3d 844 (8th Cir. 1998). Furthermore, Ark. R. Civ. P. 32(a)(2) states that "[t]he deposition of a party . . . may be used by an adverse party for any purpose." Dr. Arthur was a party defendant in this lawsuit and the Zearleys were an adverse party. Thus, the use of his deposition was a perfectly permissible practice. *See Ouachita Mining & Exp., Inc. v. Wigley,* 318 Ark. 750, 887 S.W.2d 526 (1994) (holding that Ouachita Mining was entitled to use the deposition of the defendant as part of its case irrespective of the hearsay rule and irrespective of whether the defendant was available or unavailable at trial). Moreover, our rules of evidence are clear that admissions by a party-opponent are not hearsay. Ark. R. Evid. 801(d)(2); *Ouachita, supra.* Therefore, we hold that there was no abuse of discretion by the trial court when it admitted Dr. Arthur's deposition testimony.

The appellants next assert that the trial court improperly allowed testimony from three patients other than Mrs. Zearley concerning what Dr. Arthur told them about Orthoblock prior to surgery. The appellants assert that this evidence was not admissible because it was extrinsic evidence on a collateral matter. They further contend that this testimony was not admissible during the Zearleys' case-in-chief because it was in rebuttal to Dr. Arthur's deposition testimony that had been introduced by the Zearleys in their case-in-chief.

██ ██ A matter is not collateral if the cross-examining party would be entitled to prove the issue as part of the case-in-chief , or if the evidence is relevant to show bias, knowledge, or interest. *Ballentine v. Sparkman,* 327 Ark. 180, 937 S.W.2d 647 (1997); *Pyle v. State,* 314 Ark. 165, 862 S.W.2d 823 (1993). Whether or not Dr. Arthur obtained an informed consent from Mrs. Zearley was the central issue in this case. Dr. Arthur's deposition testimony about what he told all of his patients before surgery was contradicted by the testimony of the three other patients. Their rebuttal testimony tended to shed light on the central issue

of Mrs. Zearley's informed consent, and was, thus, admissible under Ark. R. Evid. 401. Such testimony simply was not a collateral matter.[3]

 Responding to the second argument advanced by the appellants, Rule 611 of the Arkansas Rules of Evidence states in pertinent part that:

> (a) Control by Court. The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment.

We have held that Rule 611(a) vests considerable discretion in the trial court in the regulation of the mode and order of interrogating the witnesses and presenting evidence. *Piercy v. Wal-Mart Stores, Inc.*, 311 Ark. 424, 844 S.W.2d 337 (1993); *Freeman v. Anderson*, 279 Ark. 282, 651 S.W.2d 450 (1983). The trial court in this case had the authority to dictate the order in which evidence was presented, absent any abuse of discretion. During the Zearleys' case-in-chief, the appellants cross-examined Mr. Herman Zearley extensively about when his son Michael Zearley arrived at the hospital before Mrs. Zearley's first surgery. Mr. Zearley acknowledged that his deposition testimony on this point was inconsistent with his trial testimony. The appellants then sought permission to pursue this line of questioning by reading portions of Mr. Zearley's deposition testimony, arguing to the trial court that "they [the Zearleys] are going to claim he [Michael Zearley] came at a later time. . . ." When the trial court allowed the appellants to proceed, he specifically warned them that he believed they were going forward with rebuttal evidence and, thereby "opening the door" to the admission of rebuttal evidence by the Zearleys during their case-in-chief. Under these circumstances, we cannot

---

[3] Appellants misconstrue *Zearley I* when they contend that we "practically declared the informed consent conferences of all Orthoblock plaintiffs to be collateral to one another." Our holding in *Zearley I* concerned the predominance of individual issues over questions common to the members of the class, and did not concern the admissibility of collateral evidence.

say that the trial court's decision to deviate from the traditional order of proceedings and to allow the other patients to testify during the Zearleys' case-in-chief was an abuse of discretion.

■ The appellants assert alternatively that the testimony by other patients should not have been allowed because it was unfairly prejudicial. They contend that it went beyond rebuttal when all three witnesses testified that they would not have undergone the surgery using Orthoblock if Dr. Arthur had provided them with adequate information about the use of Orthoblock in ACF surgery. Under Rule 403 of the Arkansas Rules of Evidence, relevant evidence may be excluded by the trial court if "its probative value is substantially outweighed by the danger of unfair prejudice. . . ." In admitting the challenged testimony, the trial court determined that the probative value of the testimony was not substantially outweighed by any prejudice. We cannot say the trial court's evidentiary ruling was an abuse of discretion.

■ ■ As a final argument on this issue the appellants urge that the trial court erred in refusing to grant their request for a mistrial after the challenged testimony by the other patients.[4] It is well settled that a mistrial is an extreme remedy that should be granted only when the error is beyond repair and cannot be corrected by curative relief. *Marta v. State*, 336 Ark. 67, 983 S.W.2d 924 (1999); *Rychtarik v. State*, 334 Ark. 492, 976 S.W.2d 374 (1998); *Willis v. State*, 334 Ark. 412, 977 S.W.2d 890 (1998). The trial court has wide discretion in granting or denying a motion for a mistrial, and we will not disturb the court's decision absent an abuse of discretion or manifest prejudice to the movant. *Kemp v. State*, 335 Ark. 139, 983 S.W.2d 383 (1998); *Strawhacker v. State*, 304 Ark. 726, 804 S.W.2d 720 (1991). This court has repeatedly held that a mistrial is a drastic remedy which should only be used

---

[4] We note that the appellants also mention at this point in their brief, but not as a separate point on appeal, that the trial court erred in refusing to grant a mistrial after Dr. Arthur was cross-examined about having been sued 102 times in connection with Orthoblock surgeries. The trial court denied the motion for a mistrial, but later admonished the jury not to consider that testimony. We have held that an admonition to the jury is usually considered to cure a prejudicial statement unless it is so patently inflammatory that justice could not be served by continuing the trial. *Kimble v. State*, 331 Ark. 155, 743 S.W.2d 380 (1998).

when there has been an error so prejudicial that justice cannot be served by continuing the trial, or when fundamental fairness of the trial itself has been manifestly affected. *Ballentine, supra*; *Peeler v. State*, 326 Ark. 423, 932 S.W.2d 312 (1996). As previously stated with regard to the trial court's evidentiary ruling on the admissibility of the challenged testimony, we cannot say that the trial court's denial of the motion for a mistrial was an abuse of discretion.

### III. Erroneous Jury Instructions

For their third point, the appellants assert error in the trial court's giving of AMI 2204, AMI 2206, and AMI 2207, which respectively pertain to three elements of damages: future medical expenses, lost future earnings, and loss of ability to earn in the future. The basis for the argument is that no evidence was presented by the Zearleys to support the giving of an instruction on those elements of damages.

 A party is entitled to a jury instruction when it is a correct statement of the law, and there is some basis in the evidence to support the giving of the instruction. *Coca-Cola Bottling Co. v. Priddy*, 328 Ark. 666, 945 S.W.2d 355 (1997); *Yocum v. State*, 325 Ark. 180, 925 S.W.2d 385 (1996); *Parker v. Holder*, 315 Ark. 307, 867 S.W.2d 436 (1993). Absent evidence to the contrary, there is a presumption that the jury obeyed its instructions. *Pearson v. Henrickson*, 336 Ark. 12, 983 S.W.2d 419 (1999); *Northwestern Nat'l Cas. Co. v. Mays*, 273 Ark. 16, 616 S.W.2d 734 (1981). Thus, jury instructions must be based on the evidence in the case, and instructions which reference matters on which no evidence was presented should not be used. *Davis v. Davis*, 313 Ark. 549, 856 S.W.2d 284 (1993). Where reasonable minds will not differ that the evidence does not establish a basis for a jury instruction, it is error for the trial court to give the instruction. *Skinner v. R.J. Griffen Inc.*, 313 Ark. 430, 855 S.W.2d 913 (1993).

 With regard to future medical expenses as an element of damages, AMI 2204 permits recovery for medical expenses "reasonably certain to be required in the future." We have held that future medical expenses need not be proven with

the same specificity as past medical expenses. *Matthews v. Rogers*, 279 Ark. 328, 651 S.W.2d 453 (1983). However, there must be some evidence that medical treatment will be necessary in the future. *West Union v. Vostatek*, 302 Ark. 219, 788 S.W.2d 952 (1990); *Williams v. Gates*, 275 Ark. 381, 630 S.W.2d 34 (1982). The Zearleys have presented no such proof in this case. Although Dr. Saer testified about some additional impairment as a result of the second surgery, there was no testimony by any physician that Mrs. Zearley will need future medical care, such as surgery, therapy, or medication. Furthermore, Mrs. Zearley testified at trial that she was not on any medication for her neck and that she had not seen a doctor for any neck complaints since June, 1994, when she last saw Dr. Saer. Thus, there is no proof of any medical expenses being incurred by Mrs. Zearley for a period of three years before trial. In the absence of proof that medical expenses were reasonably certain to be required in the future, the jury was forced to resort to speculation and conjecture. Future medical expenses were, therefore, not an appropriate element of damages for consideration by the jury.

█ Loss of earnings and loss of earning capacity are two separate elements of damages. AMI 2206 and 2207; *Check v. Meredith*, 243 Ark. 498, 420 S.W.2d 866 (1967). Loss of future earnings must be proven with reasonable certainty. *Swenson & Monroe v. Hampton*, 244 Ark. 104, 425 S.W.2d 165 (1968). Evidence involving two basic factors is necessary to prove loss of future earnings with reasonable certainty: (1) the amount of wages lost for some determinable period; and (2) the future period over which wages will be lost. *Cates v. Brown*, 278 Ark. 242, 645 S.W.2d 658 (1983).

█ There is no proof in this record that Mrs. Zearley, at the time of trial, was still unable to work or was unable to earn as much as she did before the second surgery. She testified at trial that she has worked continuously as a pharmacist tech at a drug store since April, 1994, working forty hours or more per week. According to Mrs. Zearley's own testimony, she works hard and can do "anything that anybody else can do." Furthermore, there was no testimony by Mrs. Zearley, her physicians, or any other witness that she would be unable to continue working regularly.

The absence of proof here is similar to the absence of proof in *Check, supra,* where there was "no indication that [the plaintiff] missed even a day's work for some fourteen months immediately preceding the trial," and "[no] witness testified that it was either probable or possible that she would be unable to continue working regularly." We must conclude here, as we did in *Check, supra,* that the jury had no basis, except pure guesswork, for estimating earnings reasonably certain to be lost in the future. Future lost earnings were, therefore, not an appropriate element of damages for consideration by the jury.

 Loss of earning capacity is the loss of the ability to earn in the future and should not be confused with permanency of injury, which is a separate element of damages. *Cates, supra.* Proof of loss of earning capacity does not require the same specificity or detail as does proof of loss of future wages. *Coleman v. Cathey,* 263 Ark. 450, 565 S.W.2d 426 (1978). It is well settled that impairment of earning capacity is recoverable only upon proof that an injury is permanent. *Wheeler, supra.* The issue of permanency of impairment was submitted to the jury based upon Dr. Saer's testimony that patients who undergo revision surgery usually suffer some "little additional impairment as a result of the second surgery." However, there is no indication by any witness, including Mrs. Zearley, that she might not be able to perform her job as well in the future. She testified that she had worked at a shoe store for minimum wage before the second surgery, and that, at the time of trial, she had worked continuously for three years at a pharmacy, presumably for minimum wage. In contrast to *Wheeler, supra,* where the defendant contended that the trial judge erred in admitting evidence of loss of earning capacity because the plaintiff failed to show with reasonable certainty that her injuries were permanent, in this case there is no evidence of any loss or diminution in Mrs. Zearley's ability or capacity to earn in the future. Loss of earning capacity was, therefore, not an appropriate element of damages for consideration by the jury.

 We hold that the trial court erroneously instructed the jury on three elements of damages: lost future earnings, loss of ability to earn in the future, and future medical expenses. Because this case was submitted to the jury on a general verdict, the appel-

lants are not able to show that they suffered any prejudice by the giving of the erroneous instruction on damages. However, we have made it clear that prejudice will be presumed from the giving of an erroneous instruction unless some additional factor makes it clear that the erroneous instruction was harmless. *Dillard Dep't. Stores, Inc. v. Adams*, 315 Ark. 303, 867 S.W.2d 442 (1993); *Skinner, supra*; *Davis, supra*. An example of a factor which renders the error harmless is where it is apparent that the jury was not misled because the jury rejected the theory advanced by the erroneous instruction. *See Ouachita Wilderness Inst. v. Mergen*, 329 Ark. 405, 947 S.W.2d 780 (1997) (concluding that damages awarded included only fair market value, rendering an erroneous instruction on incidental expenses harmless). Likewise, another example is where the erroneous instruction was obviously cured by other correct instructions. *See Davis, supra* (holding that the failure to include an instruction on concurrent causes was cured by the submission of an instruction on comparative fault, which contemplates comparing two causes of an accident and the negligence associated with each cause, thus rendering the error harmless); *Long v. Lampton*, 324 Ark. 511, 922 S.W.2d 692 (1996) (ruling that an erroneous instruction requiring the plaintiffs to prove fiduciary duty was cured by testimony in which the existence of fiduciary duty was admitted, and by the giving of an additional instruction stating as a matter of law that a fiduciary duty was owed).

In the absence of some additional factor which makes it clear that the erroneous instruction was harmless, we must reverse. *Dillard, supra*; *Davis, supra*. We find nothing in this case which would make the erroneous instruction on the three elements of future damages harmless.

Reversed and remanded.

GLAZE and CORBIN, JJ., not participating.