D.B. GRIFFIN WAREHOUSE, INC. *v.* Margaret SANDERS

01-716                                              76 S.W.3d 254

Supreme Court of Arkansas
Opinion delivered May 30, 2002

*Daggett, Donovan, Perry & Flowers, PLLC,* by: *Jesse B. Daggett;* and *Friday, Eldredge & Clark,* by: *Robert S. Shafer* and *William A. Waddell, Jr.,* for appellant.

*Wilson, Valley & Etherly,* by: *E. Dion Wilson,* for appellee.

Jim Hannah, Justice. Appellant D.B. Griffin Warehouse, Inc. (Griffin), appeals a Phillips County jury verdict awarding Appellee Margaret Sanders (Margaret), individually and as administratrix of the estate of Charles Sanders (Charles), deceased, $1.5 million in damages in a wrongful-death lawsuit for Charles's death when he fell through a skylight while painting Griffin's warehouse roof in October 1991. An appeal from the first trial in this case was before this court in *D.B. Griffin Warehouse, Inc. v. Sanders*, 336 Ark. 456, 986 S.W.2d 836 (1999) ("Griffin I"), in which the jury awarded damages totaling $488,958. We reversed and remanded finding that the trial court erred in failing to direct a verdict in Griffin's favor that Delta Hardware and Lumber Company (Delta), the company hired by Griffin to perform the painting work on Griffin's warehouse roof and for whom Charles worked, was an independent contractor. Upon reversal and remand for a new trial, we limited the remaining issue to Griffin's liability to Charles as an employee of an independent contractor. This appeal arises from the second trial in this case.

After Margaret received workers' compensation death benefits from Delta's workers' compensation carrier, she brought an action against Griffin for wrongful death, alleging that Griffin had breached specified duties of ordinary care, that it failed to provide certain safety devices that would have prevented his fall, and that it failed to provide him with a safe working environment. As noted, the first trial in May 1997 ended in a jury verdict in Margaret's favor, but this court reversed and remanded the matter for a new trial due to the trial court's failure to grant Griffin's motion for summary judgment on the issue of Delta's status as an independent contractor. Although we discussed and provided for the trial court Griffin's duties to Charles, we did not rule on those issues, and specifically noted that the only issue on which the court ruled was the issue of Delta's status as an independent contractor.

After remand, the parties prepared for a second trial. On July 24, 2000, Margaret filed a motion to exclude the testimony of John Stiles and Alan Anderson, Griffin's professional structural engineers who did not testify at the first trial. At the first trial, Griffin's expert witness, William Flowers, a building contractor whom Griffin engaged after being surprised by plaintiff's witness

Odell Davis's trial testimony that there was a "bend" in the roof after Charles fell, testified as to the structural soundness of the building. On retrial, however, Griffin engaged the services of Stiles and Anderson to testify as to the structural soundness of the building and, specifically, to the condition of the skylight and surrounding metal roof. Margaret argued in her motion that under the Arkansas Rules of Evidence and case law allowing for the admissibility of evidence, Stiles's and Anderson's testimony given at their October 19, 1999, depositions did not rise to the level of expert testimony as their methodology and lack of prior expert designation rendered their testimony unreliable. Margaret argued that Stiles and Anderson did not base their findings on any particular accepted methodology or science, and questioned whether this rendered it "junk science." Furthermore, Margaret argued that these engineers did not examine the building and skylight area until July 8, 1999, and that eight years had passed from the date of the accident, making any decision on their part unreliable. Finally, Margaret argued that we determined in *Griffin I* that Occupational Safety and Health Inspector Edgar Reed's testimony indicating that there was "dry rot" around the skylight was "relevant, credible, and competent," and that this is now law of the case.

On August 2, 2000, Griffin responded to the motion to exclude Stiles's and Anderson's testimony. Griffin argued that Stiles and Anderson qualify as experts in the field of structural engineering due to their education and training, both having passed the professional-engineering examination and having worked nearly their entire careers for metal-building manufacturers or in industries utilizing metal buildings. Griffin argued that total preclusion of their testimony would be overly broad, especially considering the plaintiff cannot know what questions will be asked of Griffin's experts at trial. Finally, Griffin argued that the issue at trial was whether the roof was defective, and Griffin should be allowed to present expert testimony that it was not.

This motion was heard on the first day of trial, November 27, 2000. After hearing arguments, the court granted Margaret's motion to exclude Stiles's and Anderson's testimony. Although the court quoted substantial case law on the admission and exclu-

sion of expert testimony and evidence, the court only provided two reasons to support the exclusion of the testimony. First, the court excluded this testimony due to the remoteness in time from the accident in 1991 to Stiles's and Anderson's inspection of the warehouse in 1999. Second, the trial court, relying on one of three considerations we noted in *Farm Bureau Mutual Insurance Company v. Foote*, 341 Ark. 105, 14 S.W.3d 512 (2000), in which we quoted *Prater v. State*, 307 Ark. 180, 820 S.W.2d 429 (1991), determined that the admission of this evidence would overwhelm, confuse, and mislead the jury.

Margaret presented her case by calling seven witnesses. She first called David Griffin, owner of D.B. Griffin Warehouse, Inc. He testified that he bought the building in 1989, but that he actually only handled the money involved in the cotton-storage business. He testified that his managers, General Manager Gary Inman and Warehouse Manager Robert Manning, handled the day-to-day activity at the warehouse. He testified that he directed Inman to find a contractor to get the roof painted. He testified on cross-examination that he never saw any pockets of water in the insulation to indicate that the roof ever leaked or that any of the skylights were broken or defective. Finally, he testified that after the accident in 1991, he did not authorize any major repairs of the roof, but that he did authorize the temporary repair with a piece of metal roofing to the hole where the skylight was located.

Manning testified next that he inspected the roof prior to getting bids for the painting contract. Manning, who weighed approximately 290 pounds when he inspected the roof in 1991, testified that he walked the entire length of the roof across the purlins, or steel support beams, and the unsupported tin roofing sections. He viewed the skylights and noted that none were broken or leaking, and he also noted that he did not see any damage around the skylights. Manning also testified that after the accident, he again walked on the roof, and created a temporary repair over the hole. He indicated that he put a piece of tin underneath the open area, secured it with a few screws to the existing pieces of tin, and placed some bricks on top to keep it from blowing away. He indicated that he did not tighten the bolts to make the tin and the open area as close as possible, but rather just put the tin in

place to cover the hole, knowing that it would probably leak. On cross-examination, he indicated that the skylight material was affixed to a purlin on either end.

Next, Inman testified that the only connection he had to the warehouse and the painting project occurred when Griffin told him to find a contractor to paint the roof, and Inman hired Delta. He testified that it never came to his knowledge that the warehouse had a leak, defect, or other problem, other than it needed painting.

Following Inman's testimony, Griffin's attorney again raised the issue of the exclusion of its experts's testimony. Griffin's counsel argued that his experts would have testified about how the skylight was connected to the purlins, and that the experts had reviewed the Metal Building Manufacturers Code and found that the building was built according to code. Because Margaret's attorney attempted to imply that the purlins were not connected to the sides of the lights, and that this somehow was a defect in the building plans, Griffin's counsel indicated that the experts would testify that the building was built to the standard of the industry. Margaret's attorney responded that Margaret planned to present testimony from Gary Carpenter that it was standard practice to bolt the skylight from purlin to purlin, and this particular skylight was only connected on the ends. The trial court again excluded the experts from testifying, based on the same reasons as before.

Odell Davis Jr. testified next. Davis was one of Charles's co-workers who was on the roof at the time of the accident. Davis testified that although no one from Griffin advised him personally of any dangers regarding the building or the job, Charles himself told them not to step on the skylights. He testified that they were on the roof for only about ten to fifteen minutes before Charles fell, and that he did not inspect the skylight or the hole after the accident that day. He testified that several days after the accident, he and some other workers went back on the roof to cover the hole with some plastic, and that the roof had "soft spots." He said that when he put the plastic over the hole, he was laying on his stomach, and that it appeared to him that the tin had bent on one side of the hole. On cross-examination, Davis testified that his

work group had painted another part of the roof and found no problems with the roof or the skylights. He also testified that he had made an earlier statement that Charles was stepping backwards as he began spraying a test pattern, and that although Davis saw a bend in the tin, he could not say for sure that that was where Charles stepped. Davis did not see Charles fall. Davis was filling his spray-paint container. Davis heard a noise and looked up to see Charles chest high as he fell through the skylight. Finally, Davis testified that he believed that the screws in this skylight were in the wrong place for proper support, but he conceded that at the first trial he testified that he did not know whether they were in the proper position.

Finally, Margaret called Edgar Reed, the OSHA inspector in 1991, and he testified briefly that, when asked by plaintiff's counsel in 1995 whether the skylight had dry-rotted, he responded, "Yes." He stated that the skylights were part of the roof.

Following Reed's testimony, the plaintiff rested and Griffin's counsel attempted to make its motion for directed verdict. However, the trial court, not wanting to spend "a lot of time now that I think would be best spent before the jury with the trial," noted that Griffin had preserved its motion but delayed hearing the motion and arguments until the next court recess.

Griffin then presented its case, beginning with Edgar Reed. Reed provided information regarding the OSHA regulations surrounding the painting of a roof, and indicated that the OSHA regulations for painting a roof had been violated. Reed indicated that the skylights should have been guarded with a railing protecting a man weighing up to 200 pounds, or the skylights should have been covered with plywood that would have supported a 200-pound man. Reed noted that here, it was Delta's obligation, as the employer, to provide these protections. James Moorehead, a safety engineer, testified next and basically reiterated the comments made by Reed, especially highlighting that the employer, Delta, was responsible for protecting its workers on Griffin's roof.

The court took up the directed-verdict motion following Moorehead's testimony. Griffin made several points in its argument, including that there was no evidence that the warehouse

premises were unsafe, that no one from Griffin knew or should
have known that the premises were unsafe, or that the warehouse
roof had any sags, leaks, cracks, dents, or depressions in the tin to
lead the owner to believe that there was a defective or dangerous
condition. Griffin argued that there was no evidence that the sky-
lights were weakened over time, and that even if the actual light
was weakened, all of the workers knew not to step on them any-
way as they were an obvious danger, weakened or not. Further-
more, Griffin noted that any allegation that Griffin failed to
inspect the roof was false because Manning, weighing 290 pounds,
walked the entire roof before contracting the job to Delta, and he
testified that he saw no dangers or defects in the roof. Addition-
ally, the roof never collapsed with the weight of any of the Delta
workers during the two times they were on the roof priming and
painting it. Next, Griffin argued that it did not fail to maintain
inspection and safety of the roof before assigning the painting job,
and that Griffin's only duty was to warn Delta of any known dan-
gers that were not open and obvious. Griffin also noted that they
could not warn of any danger in the housing of the skylight, if it
existed, because Manning's inspection of the roof did not show
that, and that the only evidence to this effect was Davis's testi-
mony that the entire roof felt "soft" and that he thought there was
a bend in the tin near the skylight. Griffin argued that there was
no evidence as to how Charles fell through the skylight, as no one,
including Davis, saw him fall, or saw how or why he fell. Any
allegation that the tin "bent" and threw him into the skylight is
pure speculation, particularly because there was no evidence that
the tin was bent due to Charles's weight, or that there was even a
"dent" in the tin anyway.

Margaret's attorney responded that the Arkansas Supreme
Court already ruled that a material issue of fact remained as to
whether there were hidden or latent dangers, and that the evi-
dence conflicted as to the condition of the roof and skylight at the
time of the accident. Griffin's attorney responded that the condi-
tion of the skylight was irrelevant, even if it had dry-rotted,
because Charles knew before getting on the roof that the skylight
was an obvious danger of which the Delta employees had been
warned. He continued arguing that there was no direct proof as

to how Charles fell, or that the dent in the tin by the skylight was in any way related to the fall. As such, any conclusion was speculation. Following these arguments, the court indicated that it would rule on the motion the following day.

The second day of trial proceeded with Griffin's next witness, Gary Carpenter. Carpenter, Delta's owner, testified that he visited the warehouse site after he was awarded the job, and climbed up to the roof to determine what type of primer to use on the metal. He described the building as "a typical metal building," and he indicated that he saw no dents or depressions in the roof that would indicate any type of structural defect. He noted that he observed the skylights, and that they are not structurally sound and should be treated like glass. He stated that he discussed the job and, particularly, the skylights with Sanders and the other two workers prior to undertaking the job, and noted that they, too, had skylights in the building in which they worked. He indicated that although he felt the "spring" or "give" in the metal roofing between the purlins, the building was constructed to regional standards for this part of the country, and that during his inspection he had no concerns about the structural integrity of the building. He indicated on cross-examination that while he thought it was "standard operating procedure" to bolt a skylight "on both ends as well as attached to the metal, to their sides," he testified that he did not say that the skylight was "supposed to be bolted down to the purlin on both ends and bolted down in the middle," due, in part, to the fact that not every piece of material ended on a purlin.

Randall Hurd, a contractor, testified next that when his company submitted a bid to paint the warehouse roof, he, too, climbed on the roof to inspect it. He testified that he did not see any structural defects or damages to the roof or the skylights, and that the skylight would not support a person's weight. He also testified that walking on the tin between the purlins would cause some "flex" but that it was normal. He also indicated that he did not see any creases or bends on any of the roof panels.

Finally, Manning testified again that when he and his crew performed the skylight repair following the accident, he did not

see any damage or dents in the ridges and valleys of the tin roof pieces, and that the only damage he saw was to the skylight itself.

Following its case, Griffin renewed its motion for directed verdict on the basis of that argued the day before, and on the basis that, as a matter of law, if the skylight covers or railings had been put in place by Delta, the accident would not have occurred. However, again, the court deferred making a decision on that motion. The parties then discussed the jury instructions, the court charged the jury and gave those instructions, and then prior to closing arguments, Griffin's counsel indicated that the trial court had declined to rule on the motions for directed verdict. To this, the trial court responded, "The court has not declined to do so. The court has denied." Counsel gave closing arguments, and the jury retired. During deliberations, Griffin proffered testimony from Stiles's and Anderson's depositions, and also photographic evidence of the roof. The jury then returned and rendered its verdict in favor of Margaret Sanders in the amount of $1.5 million dollars. Griffin raises three points on appeal, but because we find that there was no substantial evidence that Griffin breached a duty to Charles, we reverse and dismiss this case.

Griffin argues that the trial court erred in denying Griffin's motion for a directed verdict on the issues of negligence and proximate cause. Griffin argues that there was no testimony that the condition of the roof, apart from the obvious danger of the skylights and the edge of the roof, presented a risk of harm, nor was there any testimony that Griffin knew or should have known that the roof presented an unreasonable risk of harm either because of the "soft" spots or because of the way in which the skylight was attached to the roof. Griffin asserts that there is insufficient evidence that it breached a duty to Sanders or that any act or omission was the proximate cause of Sanders's death.

Margaret responds that Griffin knew that the skylight was obviously damaged with dry-rot and that the skylight was a part of the roof. Margaret argues that these "defects" in the skylights, as part of the roof, were corroborated by Davis who testified that Sanders told the workers not to step on the skylights, and that Davis also indicated that they felt "soft spots" when they were

working on the roof. He further testified that the tin "gave way" around the skylight where Charles fell through, and that the skylight was defective because it was not attached to the purlins. Margaret argues that this testimony shows the existence of a "defect and hazardous condition." She argues that this testimony created conflicting evidence, making a directed verdict improper.

A directed-verdict motion is a challenge to the sufficiency of the evidence, and when reviewing a denial of a motion for a directed verdict, this court determines whether the jury's verdict is supported by substantial evidence. *See, e.g., Pettus v. McDonald II*, 343 Ark. 507, 36 S.W.3d 745 (2001); *Farm Bureau Mut. Ins. Co. v. Foote*, 341 Ark. 105, 14 S.W.3d 512 (2000); *State Auto Property Cas. Ins. Co. v. Swaim*, 338 Ark. 49, 991 S.W.2d 555 (1999). Substantial evidence is defined as evidence of sufficient force and character to compel a conclusion one way or the other with reasonable certainty; it must force the mind to pass beyond mere suspicion or conjecture. *See State Auto Property Cas. Ins. Co. v. Swaim, supra; City of Little Rock v. Cameron*, 320 Ark. 444, 897 S.W.2d 562 (1995); *St. Paul Fire & Marine Ins. Co. v. Brady*, 319 Ark. 301, 891 S.W.2d 351 (1995).

When determining the sufficiency of the evidence, we review the evidence and all reasonable inferences arising therefrom in the light most favorable to the party on whose behalf judgment was entered, and we give that evidence the highest probative value. *See State Auto Property Cas. Ins. Co. v. Swaim, supra; Arthur v. Zearley*, 337 Ark. 125, 992 S.W.2d 67 (1999); *Union Pac. R.R. Co. v. Sharp*, 330 Ark. 174, 952 S.W.2d 658 (1997). A motion for a directed verdict should be granted only when the evidence viewed is so insubstantial as to require the jury's verdict for the party to be set aside. *ConAgra, Inc. v. Strother*, 340 Ark. 672, 13 S.W.3d 150 (2000); *Wal-Mart Stores, Inc. v. Kelton*, 305 Ark. 173, 806 S.W.2d 373 (1991). A motion for a directed verdict should be denied when there is a conflict in the evidence or when the evidence is such that fair-minded people might reach different conclusions. *Wal-Mart Stores, Inc., v. Kelton, supra; Stalter v. Coca-Cola Bottling Co.*, 282 Ark. 443, 669 S.W.2d 460 (1984). Under those circumstances, a jury question is presented, and a directed verdict is inappropriate. *Wal-Mart Stores, Inc., v. Kelton*,

*supra*; *Stalter v. Coca-Cola Bottling Co.*, *supra*. It is not this Court's province to try issues of fact; we simply examine the record to determine if there is substantial evidence to support the jury verdict. *Wal-Mart Stores, Inc., v. Kelton*, *supra*; *City of Caddo Valley v. George*, 340 Ark. 203, 9 S.W.3d 481 (2000).

To begin our analysis, we revisit our decision in *Griffin I* to determine exactly what we decided in that case to determine how it affects this decision. In *Griffin I*, this court determined that the trial court erred in finding that Delta was not an independent contractor, and we reversed and remanded the case for a new trial limiting the issue as to Griffin's liability to Charles as an employee of an independent contractor. *See Griffin I*, 336 Ark. at 469. Furthermore, to provide guidance to the trial court for retrial, we also discussed the duty owed by Griffin to Delta and its employees and to state that disputed facts in the first trial existed regarding whether there was a hidden or latent danger about which Griffin should have advised Delta. We based this determination on the supposedly conflicting testimony provided by Manning and Carpenter that their inspection of the roof indicated that there were no defects, while Reed and Davis indicated that the skylight had "dry-rot" and the tin around the accident area had an indentation. We further stated that "we cannot say that there was no 'evidence of the existence of any defect or hazardous condition,'" and to indicate that we deferred to the jury's determination of credibility of the witnesses. *Griffin I*, 336 Ark. at 468. However, on review of the testimony and evidence from the second trial, it becomes apparent that there is no substantial evidence whatsoever that there was a latent defect or danger that caused Charles's fall.

We laid out Griffin's duty to Delta and its employees in *Griffin I*, noting that it is generally recognized that an employer of an independent contractor owes a common-law duty to the contractor's employees to exercise ordinary care for their safety and to warn against any hidden dangers or unusually hazardous conditions. *Jackson v. Petit Jean Electric Co-op*, 270 Ark. 506, 606 S.W.2d 66 (1980) (citing *Gordon v. Matson*, 246 Ark. 533, 439 S.W.2d 627 (1969)). Furthermore, the duty of an employer of an independent contractor to use ordinary care or to warn of latent dangers does not contemplate a duty to warn of obvious hazards which are an

integral part of the work the contractor was hired to perform. *Id.* An owner may avoid liability by providing timely notice of a latent dangerous condition of which he is, or reasonably should be, aware. *Phillips v. Morton Frozen Foods,* 313 F. Supp. 228 (E.D. Ark. 1970) (interpreting Arkansas law in *St. Louis, I.M. & S. Ry. Co. v. Dooley,* 77 Ark. 561, 92 S.W. 789 (1906) and *Dixon v. United States,* 296 F.2d 556 (8th Cir. 1961)).

■ ■ The question of the duty owed to the plaintiff alleging negligence is always one of law and never one for the jury. *Griffen I, supra; DeHart v. Wal-Mart Stores,* 328 Ark. 579, 946 S.W.2d 647 (1997); *Lawhon Farm Supply, Inc. v. Hayes,* 316 Ark. 69, 870 S.W.2d 729 (1994); *Catlett v. Stewart,* 304 Ark. 637, 804 S.W.2d 699 (1991); *Keck v. American Employment Agency, Inc.,* 279 Ark. 294, 652 S.W.2d 2 (1983). If the court finds that no duty of care is owed, the negligence count is decided as a matter of law. *Griffen I, supra; Dunn v. Westbrook,* 334 Ark. 83, 971 S.W.2d 252 (1998); *Smith v. Hansen,* 323 Ark. 188, 914 S.W.2d 285 (1996). Duty is a concept that arises out of the recognition that relations between individuals may impose upon one a legal obligation for another. *Shannon v. Wilson,* 329 Ark. 143, 947 S.W.2d 349 (1997), citing W. Prosser, *Handbook on the Law of Torts,* § 42 at 244 (1971).

■ As we noted in *Griffin I,* and as is apparent on retrial, the Delta employees were aware that the skylights posed an obvious hazard or danger that was an integral part of the work Delta was hired to perform. Therefore, Griffin had no duty to warn of these dangers because they were obvious and part of the work. However, the issue becomes whether there were latent dangers or defects known, or reasonably should have been known, to Griffin about which it should have warned Delta. The evidence does not support such a finding, and, therefore, Griffin did not breach a duty to Charles.

In looking at the testimony from the second trial, it is clear that there is no testimony, much less "disputed" testimony, regarding whether there was a known or unknown latent danger or defect in the roof. To understand this, we ask several questions regarding the alleged latent danger or defect, presumably the

"bend in the tin," in order to determine whether a duty was owed. First, the court must ask whether there was actually a "bend in the tin." According to the evidence, only Davis testified that he saw a bend in the metal next to the skylight, but he did not say whether the bend existed before the accident, only after the accident, or that Charles was the one who caused the bend when he fell. Carpenter and Inman testified that they did not see a bend or dent in the metal roof next to the skylight. Therefore, as we noted in *Griffin I*, this particular fact was in dispute. However, in *Griffin I*, we ended our inquiry there.

Now, we must move to the next question in our inquiry regarding whether, viewing this evidence in the light most favorable to the appellee, this was evidence of a latent danger or defect. In all of the testimony at trial, no witness testified that the bent metal was a danger or defect, latent or otherwise, nor was there any testimony that this was even the cause of the accident. There was no expert who testified about the makeup, pliability, shortcomings, dangers, or defects of a tin roof, and no evidence that one must be warned about the flexibility of such a metal. Rather, while Davis testified that the roof had "soft spots," the testimony from Carpenter and Hurd indicated that it was normal that metal roofs had a "flex" when one walked on them, and that the building was built to code. Furthermore, even if we assumed, without any evidence indicating such, that the nature of a tin roof is dangerous or defective, the court must ask whether Griffin knew or should have known of that defect or danger after exercising reasonable care and foresight, given the surrounding circumstances. Again, there is absolutely no testimony in this regard. Rather, the evidence indicates that Griffin's employees and Carpenter and Hurd walked and inspected the roof and never noticed a problem.

Again, the only evidence indicating that there could have been a problem with the tin roof was Davis's testimony, and he could not say that the bend in the tin, if it even existed, was the cause of Charles's fall. There is no indication whether this bend existed before the accident, after the accident, or even if it was caused by the accident. Davis did not see Charles when he fell or from what point the fall began. As such, there is no evidence that

this bend in the metal roof was even involved in Charles's fall. Any indication that it was would be mere speculation.

Furthermore, the OSHA investigator's testimony that the skylight was "dry-rotted" also provides no basis for a finding that there was disputed evidence. In reviewing the transcript here, the OSHA investigator, Reed, testified that the "skylight" was dry-rotted, but not that the metal purlins or supports were dry-rotted. This is important because any allegation that this is a "defect" or "danger" is irrelevant — the skylights were a known hazard, thus not creating any duty on Griffin to warn of any "defect" or "danger," whether in the form of dry-rot or otherwise, in the skylight itself. Therefore, any testimony about the "skylight" being hazardous does not create a question of fact creating a duty to warn.

■ This is a tragic accident, indeed; however, there is no evidence about what caused Charles's fall, no evidence that a latent danger or defect existed about which Griffin had a duty to warn Delta's employees, and no evidence that a latent danger or defect caused Charles's fall. Any allegation of such is pure speculation. Furthermore, any evidence of the skylight's alleged problems is irrelevant — the skylight was an admittedly hazardous condition about which the Delta employees were aware, and it was Delta's responsibility, as the employer, to provide the necessary protections for such obvious hazards. Pursuant to the requisite duties outlined in *Griffin I*, and on which this case was retried, Griffin did not breach a duty to Charles that caused his death.

Reversed and dismissed.

BROWN and IMBER, JJ., dissent.

ROBERT L. BROWN, Justice, dissenting. I would not dismiss this case but, instead, would reverse and remand for a new trial. In the first appeal in this matter, we made the following statement:

> In the instant case, however, disputed facts exist regarding the *hidden* or *latent* dangers involved in the painting of appellant's roof and whether or not those dangers were known or could have been discovered by appellant with reasonable care.

*D.B. Griffin Warehouse, Inc. v. Sanders*, 336 Ark. 456, 466, 986 S.W.2d 836, 841 (1999) (*Griffin I*) (emphasis in original).

In *Griffin I*, we went on to say that the OSHA inspector, Edgar Reed, testified that "it was apparent that the skylights had dry rot." In addition, Odell Davis testified that he noticed an indentation in the tin around the skylight which suggested that is where the victim, Charles Sanders, had stepped and that the tin had bent and given way. We then concluded:

> After reviewing the evidence and all reasonable inferences arising therefrom in the light most favorable to Mr. Sanders, we cannot say that there was no "evidence of the existence of any defect or hazardous condition." It is well settled that the weight and value of testimony is a matter within the exclusive province of the jury. *Esry, supra.* We, therefore, defer to the jury's ascertainment of the credibility of the witnesses who testified about the roof's condition at the time of the accident.
>
> Based upon all of the evidence in this case, we cannot say that no substantial evidence existed to support the jury's verdict on the issue of Griffin's liability.

*Griffin I*, 336 Ark. at 468, 986 S.W.2d at 842. We reversed and remanded because the victim had been an employee of an independent contractor.

What has changed in the second trial? Nothing of significance as far as I can tell from the proof presented. The testimony from Edgar Reed and Odell Davis is the same or even more favorable to the widow. Indeed, Odell Davis's testimony is stronger in the second trial. He testified that there were "soft spots" all over the roof and that "all of those skylights. . . were rotten." He further testified that the tin was "weak all around this skylight." And he testified the screws into the metal were in the wrong place where the victim fell. It seems woefully inconsistent for this court to now hold that the proof is not sufficient to support the verdict in the second trial when we held that it was sufficient in *Griffin I*.

Having said that, I believe the trial court erred in excluding part of the testimony of D.B. Griffin's two engineering experts, Alan Anderson and John Stiles. Had they been allowed to testify,

they would have opined about the overall structural integrity of the building and the fact that it was built in accordance with industry standards. That testimony, in my judgment, falls within the parameters of Ark. R. Evid. 702 as technical or other specified knowledge that would assist the trier of fact in reaching a decision. However, I would affirm the trial court in excluding their opinion testimony that there was no bend or crimp in the metal along the skylight and their opinions that the area around the skylight was not defective on the date of the accident. Such opinion testimony invades the province of the jury, and the trial court correctly excluded it.

I further would reverse on the basis of an erroneous instruction that was given to the jury on an employer's duty to provide a safe workplace. The trial court instructed the jury that: "Every employer and every owner of a place of employment, place of public assembly or public building, shall construct, repair and maintain it as to render it safe." The genesis for this instruction was Ark. Code Ann. § 11-2-117 (Repl. 2002), which deals with the duty of an employer to maintain a safe place of employment for its employees. We have interpreted the predecessor statute to § 11-2-117 (Ark. Stat. Ann. § 81-108 (Repl. 1960)) as not being applicable unless an employer-employee relationship existed. *See Horn v. Shirley*, 246 Ark. 1134, 441 S.W.2d 468 (1969). Here, the victim was not the employee of D.B. Griffin but rather was the employee of an independent contractor. Accordingly, I agree with D.B. Griffin that this instruction erroneously placed a duty on the business to make the roof safe for employees of an independent contractor. That is not the law. Rather, the factual issue for the jury to decide was whether hidden or latent dangers on the roof were known to D.B. Griffin or could have been discovered with reasonable care. I conclude that giving this instruction constituted reversible error.

IMBER, J., joins.