

# ARKANSAS COURT OF APPEALS

DIVISIONS I & II
**No.** CV-15-732

| | |
|---|---|
| | **OPINION DELIVERED** MAY 4, 2016 |
| ROBERT DURAN | |
| APPELLANT | APPEAL FROM THE MILLER COUNTY CIRCUIT COURT [NO. CV-2011-128-1] |
| V. | |
| SOUTHWEST ARKANSAS ELECTRIC COOPERATIVE CORP., CHARLES GLOVER, JR., d/b/a GLOVER TRENCHING & BACKHOE | HONORABLE CARLTON D. JONES JUDGE |
| APPELLEES | AFFIRMED |

## ROBERT J. GLADWIN, Chief Judge

Appellant Robert Duran appeals the June 25, 2015 order of summary judgment entered by the Miller County Circuit Court in favor of appellee Southwest Arkansas Electric Cooperative (SWAEC). He argues that the circuit court erred by granting summary judgment in favor of SWAEC because there was a duty of care owed to Duran and that material questions of fact remained as to whether that duty was breached. We hold that SWAEC owed no duty of care to Duran; accordingly, we affirm.

### I. *Facts and Procedural History*

At the time of the incident, Duran was employed as a heavy-equipment operator for Charles Glover, Jr., d/b/a Charles Glover Trenching & Backhoe (Glover). SWAEC was responsible for providing electrical services to a residence in Miller County that had been destroyed by a fire resulting from a lightning strike. SWAEC hired Glover to dig a trench

from the residence to an energized pad-mounted electrical transformer (PMT). Once the trench was dug, the work order further required Glover to place PVC piping, used as a conduit, in the trench from the residence up to, under, and into the PMT, which was fully energized. Then, according to the work order, the final activity was for Glover to "pull" new nonenergized electrical lines the length of the conduit. All work performed by Glover for SWAEC, including that outlined above, was conducted pursuant to the terms of a Special Services Contract executed between the parties. While installing the conduit, Duran came into contact with the energized PMT and suffered injuries.

As a result of the injuries sustained,[1] Duran filed suit against SWAEC, alleging that it failed to exercise ordinary care for his safety and to warn against any unusually hazardous conditions. On November 13, 2014, SWAEC filed an answer to the first–amended complaint that had been filed on November 12, 2014, along with a third–party complaint against Glover. On November 19, 2014, Glover filed an answer to the first–amended complaint. SWAEC filed a motion for summary judgment against Duran, and ultimately filed a renewed motion for summary judgment on December 5, 2014,[2] asserting that because Duran was an employee of an independent contractor, it owed him no duty—either to

---

[1] Duran recovered workers' compensation benefits for his injury; this appeal addresses whether Duran may go beyond those benefits to also recover in tort from the electric company that hired Duran's employer to perform the work at issue.

[2] SWAEC also filed a third-party complaint against Glover, alleging indemnification pursuant to the Special Services Contract between those two parties. The third-party complaint is not in the addendum, but the circuit court dismissed it in its order granting SWAEC's summary-judgment motion.

provide a reasonably safe work environment or to warn him of an obvious hazard that was

an integral part of the work. SWAEC cited the Special Services Contract it signed with

Glover, which contained the following pertinent provisions:

> WHEREAS, Contractor [Glover] represents that it has sufficient experienced personnel and equipment to perform, and Owner [SWAEC] desires Contractor to perform, the special services described on Schedule #1 attached to and made a part of this contract.
>
> . . . .
>
> Contractor agrees to furnish all supervision, labor, tools, transportation, equipment, and materials necessary to complete the special services required by this contract.
>
> . . . .
>
> It is understood and agreed that Contractor is an independent contractor, having control over the work done pursuant to this contract, and has no authority to obligate Owner for any payment or benefit of any kind to any person or entity.
>
> Contractor agrees to follow standard and reasonable safety practices and procedures while doing the work required by this contract.
>
> Contractor agrees to install and maintain the necessary guards, barriers, and protective and warning devices at locations where work is being performed to prevent accidents involving personnel of Contractor, personnel of Owner, or the general public.

On March 2, 2015, Glover adopted SWAEC's motion for summary judgment. On

March 4, 2015, Duran filed a response maintaining that he was owed a common-law duty

of care to exercise ordinary care for his safety and to warn against any unusually hazardous

conditions. SWAEC filed a reply brief on March 31, 2015.

The circuit court held a hearing on May 7, 2015, after which it concluded that there

were no material questions of fact remaining and that SWAEC was entitled to summary

judgment in its favor because SWAEC owed no duty to provide Duran with a safe work

environment or to warn him of the dangers of working near an energized transformer,

where working near an energized transformer was an integral part of the work Duran's employer was hired to perform, and where Duran was admittedly aware of the hazard at issue. An order was entered on June 25, 2015, consistent with the ruling, in which the circuit court also denied Duran's motion to bifurcate trial and denied the cross-motions for summary judgment filed by third-party plaintiff SWAEC and third-party defendant Glover as moot. Finally, the circuit court dismissed SWAEC's third-party complaint against Glover "on the grounds of mootness of the issues, lack of jurisdiction and non-justiciable nature of the issues as presented." Duran filed a timely notice of appeal on July 15, 2015.

## II. *Standard of Review*

The standard of review in cases in which summary judgment has been granted is well settled. Our court need only decide if the circuit court's grant of summary judgment was appropriate based on whether the evidence presented by the moving party left a material question of fact unanswered *Lloyd v. Pier W. Prop. Owners Ass'n*, 2015 Ark. App. 487, 470 S.W.3d 293. The moving party always bears the burden of sustaining a motion for summary judgment. *Id.* All proof must be viewed in the light most favorable to the resisting party, and any doubts and inferences must be resolved against the moving party. *Id.* The moving party is entitled to summary judgment if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Id.* Once the moving party makes a prima facie showing that it is entitled to summary judgment, the opponent must meet proof with proof by showing a material issue of fact. *Id.*



Moreover, the issue of duty is always one for the trial court and not the jury. *Young v. Gastro-Intestinal Center, Inc.*, 361 Ark. 209, 205 S.W.3d 741 (2005). If a court finds that no duty of care is owed, the negligence count is decided as a matter of law, and summary judgment is appropriate. *Id.*

III.  *Grant of SWAEC's Summary-Judgment Motion*

In order to prevail on a claim of negligence, the plaintiff must prove that the defendant owed a duty to the plaintiff, that the defendant breached that duty, and that the breach was the proximate cause of the plaintiff's damages. *Branscumb v. Freeman*, 360 Ark. 171, 200 S.W.3d 411 (2004); *see also Lloyd*, *supra*. The circuit court correctly noted that the general rule is that a party does not have a duty to provide a reasonably safe work environment for the employees of its independent contractor. *Stoltze v. Ark. Valley Elec. Coop. Corp.*, 354 Ark. 601, 127 S.W.3d 466 (2003). On the issue of an employer's liability to an employee of an independent contractor, Arkansas has adopted the Restatement (Second) of Torts:

> One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care.

Restatement (Second) of Torts § 414 (1965). *See also Elkins v. Arkla, Inc.*, 312 Ark. 280, 849 S.W.2d 489 (1993) (holding that even though the owner of a construction project hires an independent contractor, the owner may retain the right and duty to supervise to such extent that it becomes responsible for injury resulting from negligence in the performance of work). In order for section 414 to apply, the employer must have retained at least some

degree of control over the manner in which the work is done. *See* Restatement (Second) of Torts, § 414, Comment c, which states:

> It is not enough that he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations. Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his methods of work, or as to operative detail. There must be such a retention of a right of or supervision that the contractor is not entirely free to do the work in his own way.

Where there is no demonstration of an exercise of actual control or violation of the duty to warn by the entity or individual engaging an independent contractor to perform work, appellate courts will look to the contract to see if the prime contractor or owner retained the right of control or supervision and thereby assumed an additional duty of care toward employees doing the work. *See Stoltze*, 354 Ark. at 621, 127 S.W.3d at 473 (citing *Williams v. Nucor-Yamato Steel Co.*, 318 Ark. 452, 455, 886 S.W.2d 586, 587 (1994)). When there is no such right retained in the contract, appellate courts will affirm a summary judgment entered in favor of the owner or prime contractor. *Id.*

In this case, the Special Services Contract specifically stated that Glover was "an independent contractor, having control over the work done pursuant to this contract." Because SWAEC retained no right to control the work, we hold that it did not assume any additional duty of care toward Glover's employees, here Duran, who were doing the work.

We next look to any other duty SWAEC might have owed Duran. It is generally recognized that an employer of an independent contractor does owe a common-law duty to the independent contractor's employees to exercise ordinary care for their safety, which is basically a duty to warn against any hidden dangers or unusually hazardous conditions.

*Jackson v. Petit Jean Elec. Co-op.*, 270 Ark. 506, 606 S.W.2d 66 (1980). *See also Gordon v. Matson*, 246 Ark. 533, 439 S.W.2d 627 (1969) (stating the general rule that the responsibilities of the contractor to employees of the subcontractor on the job are comparable to the duties of the owner of the premises, including a duty to exercise ordinary care and to warn in the event there are any unusually hazardous conditions existing which might affect the welfare of the subcontractor's employees).

In *D.B. Griffin Warehouse, Inc. v. Sanders*, 349 Ark. 94, 76 S.W.3d 254 (2002), our supreme court held, however, that this duty of an employer of an independent contractor to use ordinary care and to warn of hidden dangers or unusually hazardous conditions does not contemplate a duty to warn of obvious hazards that are an integral part of the work the independent contractor was hired to perform. But the "obvious–danger" limitation does not bar recovery when the independent contractor is forced, as a practical matter, to encounter a known or obvious risk in order to perform his job. *See Culhane v. Oxford Ridge, LLC*, 2009 Ark. App. 734, 362 S.W.3d 325.

In *Griffin*, *supra*, a warehouse owner hired an independent contractor to paint the roof. The independent contractor's employee was killed when he fell through a skylight on the roof while performing the job. The supreme court reversed a jury verdict in favor of the employee's estate, holding that the warehouse had no duty to warn the independent contractor about the dangers posed by the warehouse's skylights because the employee had previously informed other coworkers not to step on the skylights, and the danger posed by the skylights was obvious and apparent. *Id.*, 349 Ark. at 106, 76 S.W.3d at 262.

In *Jackson*, *supra*, Petit Jean Electric Cooperative hired Johnson Construction Company as an independent contractor to rebuild electrical transmission lines. Johnson's employee, Clay Jackson, was injured when he came into contact with energized lines. Jackson filed a negligence claim against Petit Jean, but the circuit court entered summary judgment in Petit Jean's favor, finding that Petit Jean owed Jackson no duty to warn about the obvious and inherent danger of working around live electrical lines. Our supreme court affirmed, writing that it could

> find no basis in the record for imposing any duty upon Petit Jean to . . . warn employees of an electrical contractor that the work as contracted for would be dangerous if not done properly. Certainly, it cannot be seriously contended that Petit Jean should isolate lines from the employees of an electrical contractor whose compensation and contractual obligations expressly contemplate working around energized lines. The duty of an employer of [an] independent contractor to use ordinary care or to warn of latent dangers does not contemplate a duty to warn of obvious hazards which are an integral part of the work the contractor was hired to perform.

*Jackson*, 270 Ark. at 509, 606 S.W.2d at 68.

Here, Duran argues that SWAEC owed him a duty to warn him against any unusually hazardous conditions. But, as noted above, this duty does not contemplate a duty to warn of obvious hazards that are an integral part of the work the independent contractor was hired to perform. *Griffin*, *supra*. We hold that in this case, the PMT was an obvious hazard that was an integral part of the work Glover was hired to perform; accordingly, SWAEC owed no duty to warn Duran.

Duran admitted in his deposition that he had been told not to touch the wires in the PMT. He likewise acknowledged that he "heard the transformer humming, so [he] knew . . . it was energized." He stated that he understood that it was high voltage. He admitted

8

that he had worked on PMTs before and had been trained by people who were more experienced than he was. He explained that in his previous experiences with PMTs, he could tell they were energized because they were humming. On the day he was injured, he said that the box was "humming louder than I have ever heard it."

Charles Glover's daughter, April, told Duran not to touch anything in the PMT; moreover, Charles Glover testified in his deposition that Duran was aware that the PMT had a high-voltage end, that "you are never supposed to be around that end" of the PMT, and that he told Duran not to touch anything attached to the transformer. From the various deposition testimony, it is clear that the hazards of working near an energized PMT were known to Glover and expressed to Duran. The Special Services Contract between SWAEC and Glover called for Glover to not only dig the trench and install the PVC conduit, but also to run the nonenergized electrical lines the length of the conduit wiring, the pedestal, and the transformer pad in preparation for their connection. These specifically listed activities necessarily involved close proximity to the PMT. Therefore, the obvious hazards were an integral part of the work the contractor was hired to perform. Under these circumstances, SWAEC had no duty to warn of obvious hazards that were an integral part of the work the contractor was hired to perform. *See Jackson*, *supra*.

Duran nonetheless argues that the work he was required to perform entailed an unusually hazardous condition, which SWAEC should have had a duty to warn him about, as discussed in *Culhane*, *supra*. We disagree. In *Henderson v. Tyson Foods, Inc.*, 2015 Ark. App. 542, 473 S.W.3d 52, this court rejected a similar argument where the employee of an independent contract or was injured while cleaning Tyson's poultry-processing machinery.

The court determined that because the employee's job was to clean that type of machinery, Tyson's duty to warn of latent dangers did not contemplate a duty to warn of obvious hazards that were an integral part of the work the independent contractor was hired to perform. *Henderson*, 2015 Ark. App. 542, at 11–12, 473 S.W.3d at 59. Likewise, here, the job that Duran was hired to perform involved an obvious hazard, specifically, working around a PMT, and Duran specifically admitted that he was well aware of the hazard. Accordingly, SWAEC had no duty to warn about that obvious hazard.

We hold that the circuit court correctly applied the law to find that under these circumstances, SWAEC did not owe a duty to Duran to provide him with a safe work environment or to warn him about the specific dangers of working near an energized PMT. Because the circuit court correctly concluded that no duty was owed, the circuit court correctly entered summary judgment in SWAEC's favor. *See Henderson*, *supra*. Accordingly, we affirm.

Affirmed.

WHITEAKER, HOOFMAN, and BROWN, JJ., agree.

HARRISON and KINARD, JJ., dissent.

**BRANDON J. Harrison, Judge, dissenting.** Today the majority opinion affirms a summary judgment against a worker who received an electric-shock injury. To affirm the dismissal with prejudice of Robert Duran's complaint against Southwest Arkansas Electric Cooperative Corp., the majority's opinion reverses the polarity of this state's summary-judgment standard to view the proof against Duran, not for him. And it doesn't address undisputed testimony from the company's own employees.

Before parsing the circuit court's ruling that Southwest owed no duty in tort to Duran in the circumstances—and this court's mistaken decision to affirm it—more of this case's story must be revealed. We are duty-bound to conduct a plenary review of the case record and view all the proof in the light most favorable to Duran, the party who opposed the summary-judgment effort.

### ADDITIONAL MATERIAL FACTS

A broad overview of the facts goes like this. In 2009, Robert Duran received an electric-shock injury while working near an energized, pad-mounted electrical transformer that Southwest owned. The parties do not dispute that Duran was Charles Glover's employee, that he received workers'-compensation benefits after the injury, and that he is statutorily barred from suing his employer in tort. The parties also agree that Duran was an employee of an independent contractor (Glover). Glover has had an established, independent-contractor relationship with Southwest since the 1970s.

When the injury occurred, Southwest and Glover had a written agreement in place titled "Special Services Contract," which generally outlined the work Glover was to do for Southwest.[3]

On the day Duran was shocked, Glover had received a work order from Southwest to dig a utility trench at a home in Miller County. (The majority largely bases its holding

---

[3] The "Scope of Work" provision in the written contract states,

"Contractor to trench & install conduit or wire to specified depth.
Backfill trench & leave to existing grade.
Install pedestal, transformer pads and other equipment to specifications."

on the parties' contract and the work order, but the documents can't bear the legal importance placed upon them. [4]) The utility trench's intended path from the house to the electrical transformer was determined and staked by Southwest's engineers. Glover was then tasked to dig a trench and install conduit, which Glover did, using his employee, Duran.

The problem occurred when Charles Glover opened the transformer box for Duran and Duran attempted to push the conduit pipe into the energized transformer. At some point Duran either touched, or came too close to touching, an energized part of the transformer and received an electric shock. All the parties agree, however, that Duran received an electric-shock injury while working on Southwest's transformer. Everyone also agrees that Glover and Duran were supposed to be working on the transformer the day they did so.

With these basic facts in mind, recall that the circuit court specifically held that Southwest "owed no duty to provide [Duran] with a safe work environment or to warn him of the dangers of working near an energized transformer, particularly when working

---

[4] By this I mean the majority opinion says that the work order "required Glover to place PVC piping, used as a conduit, in the trench from the residence up to, under, and into the PMT, which was fully energized. Then according to the work order, the final activity was for Glover to 'pull' new non-energized electrical lines the length of the conduit." But the work order states none of these things in black and white. To the extent the majority intends its statement as an inference, the record doesn't support it when viewed in the correct light.

The special-services contract contemplates Glover installing "transformer pads," but it recites nothing about working near or inside an energized, pad-mounted transformer.

near an energized transformer was an integral part of the work Glover was hired to perform, and where [Duran] was already admittedly aware of the hazard at issue." The task now is to fully appreciate the circuit court's *fact-based ruling* that "working near an energized transformer was an integral part of the work Glover was hired to perform[.]" The majority essentially agrees with this statement. To judge the statement, however, we must delve into the deposition testimony that was introduced into the case—a great deal of which the majority opinion omits.

ROBERT DURAN

According to Duran, Glover's "on-the-job training" led him to believe that he (Duran) was allowed to work on energized, pad-mounted transformers. Duran said that Glover had never taught him that he (Duran) was supposed to call Southwest so the company could de-energize an energized pad-mounted transformer before opening the transformer's secured cover. Though a Glover employee once told him not to touch anything inside an energized transformer or "it will get you," no one from Glover's business had trained him "on the anatomy of a pad mounted transformer" or explained the difference between energized and nonenergized transformers. When questioned during his deposition, Duran agreed that he was "obviously not a qualified lineman."

Speaking about the day he was shocked, Duran said that the transformer box was "extremely loud," and it was humming "louder than [he] had ever heard it." He knew that the transformer was "high-voltage." Duran also acknowledged that Southwest could shut

 

off electricity to the transformer and that a Southwest employee had in fact come "once or twice" when he was working on a job for Glover and de-energized the transformer.

CHARLES GLOVER

Glover testified during his deposition that Duran spent "lots of time" running the ditch-digging equipment. Glover also said that he tells "everybody" not to touch anything that "could be hot," but that he and his employees "touch [all transformers] when [they] are not energized." When asked specifically about the injury itself, Glover testified that Duran said his back was hurting so "instead of bending over and pulling that pipe backward[,] . . . he (Duran) reached over in [the transformer]." When questioned how he knew that Duran touched the transformer Glover replied, "It looks obvious." Here is part of the deposition colloquy:

> Q: It looks obvious to you? But he never told you that, right?
>
> A: He never told me what?
>
> Q: That he touched something inside there.
>
> A:  I am not sure if he ever did.
>
> Q: So it looks obvious. What tells you he touched something? If he didn't tell you that, and if it looks obvious from looking at the photographs—
>
> A: He did tell me that he reached in there[.]

Glover also let it be known that he had held the keys to Southwest's transformer boxes "for thirty something years" but no longer has permission to access the transformers since Duran's accident.

> Q:     Do they [Southwest] know you are out there using that key to open up these transformers?  Is that a yes?
>
> A:     Yeah.
>
> Q:     And, they are okay with that?
>
>                          . . .
>
> A:     They are not okay with it.  . . . I don't open any of them [transformers] any more.
>
> Q:     When did that change?  After this accident?
>
> A:     I guess.

Glover further agreed that, before the accident, he did not have to call Southwest and ask that its personnel come to a work site and ensure that a transformer is de-energized and safe. But now he must do so.


HAROLD CRANE (SERVICE FOREMAN FOR SOUTHWEST)

A Southwest service foreman named Harold Crane testified that he had known Charles Glover since the early 1970s and that if a transformer was "dead" then Glover would pull the wire into it; but if "anything [was] hot in there," then Southwest would do it. Southwest's service foreman agreed that it was "absolutely" necessary when dealing with "hot connections" that a person be "qualified, trained and [have] appropriate equipment and tools to make sure nobody is harmed and nobody is exposed to unnecessary risk of harm."

Another part of the proof that the majority opinion passes over is that, according to Crane, the only people who are to have the special keys and wrenches that open Southwest's

transformers are "engineers, linemen, servicemen, District Managers, in other words, [Southwest] hierarchy." He didn't know "of anyone else that had them and [he didn't] know of any reason that they [people like Glover and his employees] would have had them." Only "qualified people" could have keys. And to be "qualified," a person should be a "lineman."

Neither Glover nor Duran is a lineman. Here is Crane on the transformer–access point:

> Q: What you are telling me and what I hear you saying is this key, this wrench was never supposed to have made it into the hands of Glover Construction or any construction company?
>
> A: As far as I know.
>
> . . . .
>
> Q: Before this accident happened, [Southwest] was aware that Glover was going around, whenever they would do work like they were doing when this accident occurred, was opening and accessing those transformers without anybody from [Southwest] being present, right?
>
> A: Somebody had to know it.
>
> Q: So [Southwest] knew it?
>
> A: Yes.
>
> Q: And allowed it to continue anyway?
>
> A: Yes.
>
> Q: That shouldn't have been happening?
>
> A: In my opinion, not.

 

Southwest's service foreman also testified that, after the accident occurred, someone came in and said that "this is not going to happen again, no contractors are accessing these transformers [and] we are going to enforce this."

WILLIE KEENER (SOUTHWEST INVESTIGATOR/MANAGER)

Willie Keener, an investigator/manager at Southwest, said during his deposition that Southwest learned it had a "contractor who was doing some things that they are not legally able to do or supposed to be doing." Keener explained that the National Electrical Safety Code—and some state and federal laws—prohibited nonqualified people from working inside a transformer unless it was "de-energized." Work inside energized transformers was considered "live line work." Keener did not mince words on whether a worker like Duran should have been working on an energized transformer. Said Keener: "None of Glover's people, in my opinion, are qualified to do live line work." He also testified that Southwest kept the key and wrenches under "lock and key" in the company's warehouse and that access to the tools was restricted. Furthermore, Southwest had a "pretty firmly set procedure" that if a contractor needed "to work inside the transformer, they would call us and we would send someone out that was qualified."

> Q: Who then, at [Southwest] would go out to the transformers and put the PVC pipe under and into the transformer and run the wire?
>
> A: If they called us, and that's the way it works with other contractors that we use, if they call us, we send somebody out, we will make sure that the conditions are made as safe as possible for our employees that are going to be doing that. If it requires de-energizing the transformer and other people are involved, they may have to reschedule. They may not be able to do it right then when they want to do it, okay? It may require more than a couple of people to be there to make the

work possible.  That's why we have a procedure that they are supposed to call us before the transformer is opened, if it is energized at all.

Q:     And, that was the procedure that was in place before this accident?

A:     Oh, absolutely.

The bottom line is that, in Keener's view, Glover "should have called" Southwest if he needed someone to open the transformers.  He also confirmed that Southwest knew when Glover was scheduled to perform the work at the home.


ROY FABER (SOUTHWEST CONSTRUCTION SUPERINTENDENT)

Southwest construction superintendent Faber brought to his deposition copies of invoices that Glover had submitted to Southwest.  Nothing on the invoices indicates whether Glover worked on energized or de-energized transformers.  Faber apparently learned—after Duran's workplace injury—that some of Southwest's linemen had known that Glover was working on live transformers.  In Faber's words, Glover "shouldn't have been accessing the transformer.  He wasn't supposed to access the transformer." Importantly, Faber agreed when asked that Glover's work was restricted to "digging trenches, laying PVC pipe and, in some instances, pulling wire through" but that Glover's work did not "mess with live wires, energized wires."

Q:     What if anything, did [Southwest] or what was [Southwest] doing in 2009, before this accident, to ensure that when any kind of hot work was being done, it was supervised, by [Southwest].  And, whenever I talk about any kind of hot work, I am talking about the kind of work that is being done by Glover at the time of this accident.

. . . .

> A:   I am trying to think. If they [Glover] are not supposed to be in the energized transformer, than I guess we are not doing any checking, or making sure.

Southwest provided the PVC pipe and wire to Glover from its warehouses in Texarkana. Before Glover was given a work order, Southwest would stake out where Glover was to dig the utility trench. As Faber reported, Southwest would put white flags about ten feet apart, including a pin flag, in front of the transformer. The following questions were asked during Faber's deposition about pulling the wire into a transformer's interior:

> Q:   But you would come in and at it, underneath it, from the left side?
>
> A:   I wouldn't.
>
> Q:   But, if you are following the flags, and that's where the flags are, and that's what they are instructing you to do. And, that is what the flags are used for, right? I don't want to argue with you about it.
>
> A:   Right.
>
> Q:   I just want to make sure we are clear. You all put those flags out there for a reason?
>
> A:   Right.
>
> Q:   And, they are to be followed?
>
> A:   Yes.

TODD NEWBERG (SOUTHWEST LINEMAN)

Southwest lineman Todd Newberg testified that it was "standard operating procedure" for a crew foreman and Glover to discuss the work to be done before it was done; and Bobby Fenton was the crew manager who spoke to Glover about the work to

be done on the residence in this case. Newberg also said that he would sometimes be called to de-energize a transformer that a contractor was scheduled to work on. According to Newberg, though Glover "regularly access[ed] live transformers," he didn't know why Southwest personnel were not present when Glover accessed live transformers.

With critical pieces of this case's story now in place, we can turn to the legal decision that the majority opinion has affirmed.

### THE MISTAKEN SUMMARY-JUDGMENT DECISION

As I mentioned at the beginning, to affirm the summary judgment against Duran the majority views the record in the light most favorable to the wrong party under our standard of review. It then relies on the general rule that one who employs an independent contractor will not be held vicariously liable for the negligent conduct of the independent contractor, because the one who hired the independent contractor has no right to control the manner in which the contractor performs the contract. *See Stoltze v. Ark. Valley Elec. Coop. Corp.*, 354 Ark. 601, 607, 127 S.W.3d 466, 470 (2003) (noting the general rule and three exceptions). But this case is not a vicarious-liability case; and the rule the majority has applied is a vicarious-liability rule.

This is a direct-liability case, because the focus of the complaint is not on whether Glover acted negligently as to Duran and whether Southwest is liable for Glover's negligence toward Duran. Here, the complaint makes it clear that the legal issue is whether Southwest itself acted as a reasonable power company should under the same or similar circumstances.

Under the direct–liability theory that Duran alleges, Southwest may be held liable in tort for its own negligence if it hired Glover to perform an activity that created a risk of physical harm and if Southwest retained control over the manner in which Glover performed the hired work. *See* Restatement of Torts (Third) §§ 55–56. Our case law places some limitations on the duty that a hirer may directly owe the employee of its independent contractor, but no case law forecloses Duran's direct-negligence theory against Southwest as a matter of law.

The circuit court's ruling that Southwest "owed no duty to provide [Duran] with a safe work environment or to warn him of the dangers of working near an energized transformer, particularly when working near an energized transformer was an integral part of the work Glover was hired to perform, and where [Duran] was already admittedly aware of the hazard at issue" is not supported by the record. The majority opinion does not explain why the record, when viewed in Duran's favor, supports the determination that working near an energized transformer was an integral part of the work Duran's employer was hired to perform. It cannot. The opposite is true: the record teems with testimony from Southwest's own employees who, to their credit, candidly stated that neither Glover nor Duran was qualified to place conduit near an energized transformer. If installing conduit into an energized transformer was not something Glover and Duran were qualified to undertake, then it can't be an "integral" part of the work that Glover and Duran were hired to perform.

To the extent *Jackson v. Petit Jean Electric Coop.*, 270 Ark 506, 606 S.W.2d 66 (1980), is a direct-liability and vicarious-liability case, it's distinguishable. There, our supreme court

held that because (1) an electrical contractor's employees knew the risks involved in the work, (2) their supervisor "possessed substantial electrical experience," and (3) the employees were insured against injury by worker's compensation, they could not hold the electric co-op vicariously liable for injuries they had sustained while working near energized electrical lines. *Id.* The supreme court also held that the electric co-op owed no direct duty to provide safety devices or "proper supervision" to the employees because the co-op had not acted to supervise them and the independent contractor's "compensation and contractual obligations expressly contemplate[d] working around energized lines." *Id.* at 509, 606 S.W.2d at 68. *Jackson* makes sense. But that case's no-duty rule does not control this case for a simple reason that is undisputed in the record: Glover was not an electrical contractor who was qualified to work on energized transformers and neither was his employee Duran; yet that's what Duran was doing when he was shocked.

There is some factual support in the summary-judgment record for the statement that Duran, as the majority reports, "was already admittedly aware of the hazard at issue." But what he knew about the dangers of what he was doing, when he was doing it, can also be a matter of comparative fault. Southwest has a comparative-fault argument against Duran should the case go forward. But that Duran arguably knew that the transformer was energized and potentially very dangerous does not in and of itself mean that Southwest owed no duty to Duran as a matter of law, especially given the swarm of material facts that Southwest's employees provided on what it knew (or perhaps should have known) of Glover's activities, and its decision to limit Glover's access to transformers after Duran's injuries occurred.

The majority holds that Southwest has no possibility of legal responsibility in tort to Duran, based on the written contract Southwest has with Glover, because Southwest retained no control over Glover. The written contract is important. But it's not dispositive; we must look at all of the important circumstances when asking whether Southwest retained control over the scope and manner of the work it hired Glover to do. *Compare Williams v. Nucor-Yamato Steel Co.*, 318 Ark. 452, 455, 886 S.W.2d 586, 587 (1994) (holding that summary judgment was appropriate when there was no demonstration of an exercise of actual control and hirer retained no right of control or supervision in the written contract) with *Elkins v. Arkla, Inc.*, 312 Ark. 280, 849 S.W.2d 489 (1993) (reversing summary judgment when there was a genuine issue of material fact concerning the degree to which hirer retained the right to supervise employees of its independent contractor). The majority addresses whether Southwest had a contractual right to control Glover, but it doesn't discuss evidence of Southwest exercising actual control over Glover's work. The majority also dismisses Southwest's employee testimony that Southwest arguably retained some meaningful control over the project by stating that Glover should have called Southwest so that it could send a qualified lineman to access the energized transformer. That Southwest no longer allows Glover to access the transformers that are under lock and key is additional evidence that Southwest retains some manner of control.

Southwest told Glover what trenching jobs to do and where to do them. Its engineers staked out the trench's path to the energized transformer at issue in this case. Southwest's internal policy required it to supervise and restrict people like Glover (and Duran) from opening energized transformers; only qualified Southwest employees were

23

supposed to do that because working near energized transformers is dangerous. Southwest owed a duty to Duran. Whether it breached the duty and proximately caused Duran's injury are separate questions for another day.

## CONCLUSION

Given the facts presented in this case, Southwest owed a duty to Duran when he was injured. The circuit court's decision that Southwest owed no duty to him should therefore be reversed and the case remanded for further proceedings.

KINARD, J., joins.

*Dugger Law Firm*, by: *Terry Dugger*, for appellant.

*Friday, Eldredge & Clark, LLP*, by: *James C. Baker, Jr.* and *Kimberly D. Young*, for appellee Southwest Arkansas Electric Cooperative Corporation; and *Smith, Williams & Meek, LLP*, by: *Karen Hughes*, for appellee Charles Glover and Glover Trenching and Backhoe.